George R. Laure and Esther L. Laure, Petitioners *v.* Commissioner of Internal Revenue, Respondent

W-L Molding Co., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 1517–76, 1518–76.     Filed September 28, 1978.

D. *Alden Newland,* for the petitioners.
Peter M. *Ritteman,* for the respondent.

Drennen, *Judge:* In these consolidated cases respondent determined deficiencies in Federal income taxes as follows:

\*     \*     \*     \*     \*     \*     \*

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 1517–76 | George R. Laure and Esther L. Laure ...1971 | | $9,885.00 |
| | | 1972 | 188,205.00 |
| 1518–76 | W–L Molding Co. ......................... | 6/30/72 | 57,320.11 |
| | | 6/30/73 | 97,328.60 |

Various issues have been settled, leaving for our decision these main questions:

(1) Whether under section 162(a)(1), I.R.C. 1954,[1] amounts deducted by petitioner W-L Molding Co. as compensation for George R. Laure, its president and treasurer, were for services rendered and reasonable in amount.

(2) Whether petitioner W-L Molding Co. and Lakala Aviation, Inc., engaged in a statutory merger qualifying under section 368(a)(1)(A) so that pursuant to sections 381(a) and 172, W-L Molding Co., as the acquiring corporation, may deduct premerger net operating loss carryovers of Lakala Aviation, Inc.

(3) Whether petitioner George R. Laure received constructive dividends in 1972 to the extent certain debts of Lakala Aviation, Inc., were paid or canceled by W-L Molding Co.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners George R. Laure and Esther L. Laure (docket No. 1517–76), husband and wife, resided in Kalamazoo, Mich., when their petition was filed. They filed joint returns for calendar years 1971 and 1972 on the cash basis with the Central Service Center, Covington, Ky. Esther L. Laure is a petitioner solely because of the joint returns, and references herein to "Laure" are to George R. Laure alone.

Petitioner W-L Molding Co. (docket No. 1518–76) is a Michigan corporation with its principal offices at Kalamazoo, Mich., when its petition was filed.

W-L Molding Co. (W-L Molding) filed its returns for fiscal years ending June 30, 1972, and June 30, 1973, on the accrual basis with the Central Service Center, Covington, Ky.

## Issue No. 1

George R. Laure, founder, sole shareholder, president, and

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

treasurer of petitioner W-L Molding, is a brilliant individual who through education and experience has become highly skilled in diverse technical fields.

Before entering college Laure acquired practical experience as a tool and diemaker and as an electrician.

Laure attended Notre Dame University and in 1937 received a chemical engineering degree majoring in organic chemistry. He minored in electrical and metallurgical engineering. While at Notre Dame he began experimenting, and this practice eventually made him a substantial inventor in his own right. As a student at Notre Dame, he participated in developing a 3-million volt X-ray machine used to X-ray automobile engines. He also did basic research with synthetic rubber.

After his college education and training in developing plastics, Laure worked briefly as a chemical engineer with Seagram's Distillery before moving to the Upjohn Chemical Co. where he developed several important, patentable items, including a basic wound package used by soldiers in World War II.

Laure became interested in the production of plastics and plastics molding and started a company in 1945 which was operated as a partnership until 1955. One of the first products produced by the firm was a "colorimeter disc" used to make color determinations for pharmaceuticals and medicine. The firm also produced the "potentiometer base" for the Chicago Telephone Co. The colorimeter and potentiometer were patented by the parties for whom they were produced.

Later in 1949 Laure received his first patent, for rollers used in the broilers of stoves, ovens, and other places requiring bearings that resist heat and pressure. Prior to Laure's invention of a plastic bearing, stove doors commonly became unworkable as metal bearings rusted.

Laure also developed and patented a plastic mold guard for rod-type furniture, which mold is used by 30 to 35 percent of manufacturers of such furniture.

The plastics and plastics molding company started by Laure 10 years earlier was incorporated in 1955 as W-L Molding Co.

From W-L Molding's formation in 1955 through the tax years in issue Laure continued to invent or participate in the invention of ingenious, highly-functional items. These items included a check valve used in lightweight water systems, a wheel assembly and plastic roller used in sliding hardware, a sheet metal screw

thread and forming tool, a roller and retainer for a wire basket used in commercial dishwashers, and a display structure for pharmaceutical bottles. The patents for these items were assigned to W-L Molding.

As a result of Laure's ingenuity, W-L Molding has achieved high quality and production control. For better quality control, Laure invented an injection molding machine with an automatic control unit that can be programmed to give machine control over heat, pressure, time, and fill to plus or minus one-thousandth of a second. Also contributing to quality control is a chemical laboratory Laure designed to control density, flow factors, melting points, and K factors and to test wear, friction, and impact. For improved production control, Laure developed a "totalizing room," which is connected to counting equipment, which in turn is connected to the plant's machinery. In this totalizing room, one can determine the number of units each machine has produced in its production run, what it is producing, and to whom the product is sent. This room controls 80 to 90 sophisticated machines. Because of these control features, W-L Molding has been able to obtain and retain national customers such as IBM, Zerox, Westinghouse, and General Electric. W-L Molding also made plastic parts for the NASA space program, which required high-precision molding.

Laure also devised a way whereby a mold can be used to produce parts for many different users. Through this and automation, Laure has produced significant cost savings for W-L Molding.

Largely due to Laure's efforts, W-L Molding produced over 6,000 items and had about $4-5 million in sales for each of the years in issue. Its taxable income before net operating loss deductions was $205,273 for fiscal 1972 and $208,826 for fiscal 1973.

Further evidence of Laure's research and development skills is his work (unrelated to W-L Molding) in molded plastic prosthetics. A Dr. Arthur Steffee and Laure have been pioneers in developing successful plastic prosthetics for artificial knuckles and other body parts.

As founder, sole shareholder, and principal officer of W-L Molding, Laure was active in all aspects of the corporation's business. Indeed a concern of W-L Molding's principal creditor was that Laure was irreplaceable. Laure performed the func-

tions of a manager, chemical engineer, electrical engineer, sales engineer, production design engineer, and secondary operations engineer. He also is licensed to fly single- and multi-engine aircraft, and he did most of W-L Molding's flying at one time. Through Laure's use of air charter service, Laure and W-L Molding's employees were able to travel around the country delivering plastic parts and servicing customers. Laure's use of air service was an important part in W-L Molding's growth as a nationwide supplier of plastic products.

At W-L Molding's first board of directors' meeting in 1955, Laure was voted a salary of $30,000 per year. About a month later, his compensation was increased by allowing him to draw, in addition to his $30,000 salary, a sum equal to up to 25 percent of W-L Molding's net profits before taxes.

In July 1959 Laure's base salary was increased to $48,000 per year, in August 1967 to $60,000 per year, and in June 1973 to $72,000 per year.

In respondent's notice of deficiency to W-L Molding, he determined that $38,160 of Laure's compensation for fiscal years ending June 30, 1972, and June 30, 1973, was excessive. The amounts set forth in the notice of deficiency are as follows:

|  | 6/30/72 | 6/30/73 |
|---|---|---|
| Nondeferred compensation per return | $138,445 | $121,245 |
| Deferred compensation per return | 15,660 | 15,660 |
| Total compensation claimed | 154,105 | 136,905 |
| Less: total allowed compensation | 115,945 | 98,745 |
| Excessive compensation | 38,160 | 38,160 |

For its fiscal years ending June 30, 1972, and June 30, 1973, W-L Molding made payments to its executive vice president, George D. Simpson, of $28,670 and $33,200, excluding pension benefits, that it deducted as salary. Simpson was mostly in charge of overall plant production and tooling. Also, during the 10 to 15 percent of the time when Laure was away from the plant on company business, Simpson ran the plant.

As of June 30, 1972 and 1973, W-L Molding had retained earnings of $917,842.42 and $1,010,578.81, respectively.

W-L Molding never declared and paid a dividend for any of the years 1955 through June 30, 1973.

W-L Molding has borrowed money from American National Bank and Trust Co. of Kalamazoo, Mich., since 1967. One of the

conditions of the loans was that written consent of the bank was required before dividends could be paid. The bank was concerned that amounts withdrawn from W-L Molding as salary or dividends might impair W-L Molding's ability to repay the loans. W-L Molding never requested the bank's permission to pay a dividend.

The value of W-L Molding in 1972 and 1973 was not less than $1 million, and Laure has been offered $3 million for his stock by a third party.

*Issues Nos. 2 and 3*

Lakala Aviation, Inc., a Michigan corporation, was incorporated by George R. Laure in March 1958. Laure was Lakala's sole shareholder from its inception until its termination on March 31, 1972. Lakala was incorporated to provide charter air service, to service and maintain airplanes, and to sell aviation gasoline and airplane parts.

In March 1958 Laure loaned Lakala $10,000 at 6-percent interest.

In June 1958 Lakala purchased an airplane from W-L Molding for $2,000.

Lakala provided passenger and freight charter service to W-L Molding and other parties. Prior to 1958 W-L Molding needed an airplane on a 24-hour-a-day basis, and the only possible provider, Kalamazoo Flying Service, was unable to provide aircraft on a consistent basis. With air service, W-L Molding was able to go to several east coast cities and handle a great deal of business in a short period of time; production parts also could be supplied expeditiously to keep production lines open. The air service operations were set up in a separate corporation (Lakala) to avoid exposing W-L Molding's assets to liability from Lakala's operations.

In 1962 Lakala's articles of incorporation were amended to allow the corporation to perform light manufacturing. Subsequently, a machine shop was opened at the Lakala airplane hangar. Seven machine tools were purchased by Lakala from W-L Molding at W-L Molding's cost. At the same time, four W-L Molding employees went to work for Lakala.

In November 1969 Lakala borrowed $150,000 from Laure at 10-percent interest repayable at $5,000 a month, to be paid in full before October 17, 1972.

In January 1970 Lakala agreed to lease a Jet Commander Model 1121 airplane from Scope, Inc., an unrelated corporation, for $566,906.40 payable at the rate of $7,875 a month. The lease obligations of Lakala were personally guaranteed by George R. Laure and Esther L. Laure.

From 1967 through March 31, 1972, there were two fixed-base charter services operating out of the Kalamazoo, Mich., Municipal Airport, Lakala and Kal-Aero, Inc. In 1970 Kal-Aero, Inc., maintained an airfreight service and was capable of repairing piston-engine aircraft.

Over the years, W-L Molding made advances to Lakala, and Lakala made payments or received credits from W-L Molding in these amounts:

| Period | Advances and accrued interest | Payments and credits | Balance due W–L Molding |
|---|---|---|---|
| As of 4/1/68 | $126,895.37 | --- | $126,895.37 |
| 4/1/68 to 3/31/69 | 71,638.74 | $127,526.79 | 71,007.32 |
| 4/1/69 to 3/31/70 | 101,084.26 | 41,845.04 | 130,246.54 |
| 4/1/70 to 3/31/71 | 140,514.62 | --- | 270,761.16 |
| 4/1/71 to 3/30/72 | 151,399.59 | 107,488.88 | 314,671.87 |

In about 1968, after profitable years, Lakala began losing money as a result of a decline in the use of air charter services in the Kalamazoo area and other factors. The Jet Commander lease also became unprofitable; the jet was too inconvenient and time consuming to land only at major airports. The taxable income or net operating loss of Lakala for fiscal years ended March 31, 1969, through March 31, 1972, was as follows:

| | |
|---|---|
| TYE 3/31/69 | ($148,958.65) |
| TYE 3/31/70 | 13,427.49 |
| TYE 3/31/71 | (116,473.35) |
| TYE 3/31/72 | (71,373.63) |

Consideration was given to the possibility of merging Lakala into W-L Molding as early as February 1971, at which time a national accounting firm drafted a proposed ruling request regarding the tax-free status of the merger. However, merger plans were suspended for some time and no ruling request was ever submitted to the Internal Revenue Service.

By January 1972 W-L Molding and Lakala had decided to merge with W-L Molding to be the surviving entity. Pursuant to these merger plans, Lakala disposed of all its assets over the period of January to April of 1972.

On January 3, 1972, all real property owned by Lakala (land and a hangar facility) was transferred by deed to W-L Molding.

On January 31, 1972, George Dombrowski, attorney for Lakala and W-L Molding, sent the director of the Kalamazoo Airport Authority a letter requesting still another 3 months (previous extensions already had been allowed) to review whether Lakala could construct an additional hangar at the airport in order to comply with the City of Kalamazoo's requirement that such a hangar be constructed to meet the base operation lease agreement with Lakala.

On February 14, 1972, Dombrowski was notified by the Kalamazoo Airport Authority that, effective April 1, 1972, the Lakala-City of Kalamazoo lease was canceled because of Lakala's failure to start the construction of an additional hangar as required by the lease agreement.

On February 18, 1972, Laure, as president of Lakala, sent a letter to the Kalamazoo Airport Authority to inform it that:

> Effective April 1, 1972, Maurice Hovious will be taking over the business in its entirety and in all probability will continue to operate under the name of Lakala Aviation, Inc. which I have authorized him to do. As of April 1, 1972, I will have no direct connection with this business although my W-L Molding Company will own the land and buildings. As I further mentioned to you, I am very definitely interested in having Maurice make a real success of this operation since he does have not only the qualifications to do this but also the drive and additional manpower to accomplish this. As I further mentioned to you, The W-L Molding Company will continue to own aircraft and we want them hangared and serviced at Lakala.
>
> Maurice does have the backing to fulfill your requirement for an additional hangar and he has the necessary agreement from both The W-L Molding Company and me to construct the hangar on the premises which he will be renting.

On March 30, 1972, a merger was completed by Lakala and W-L Molding pursuant to a document called an agreement of merger.

On April 1, 1972, pursuant to preexisting agreements: (1) W-L Molding sold accounts receivable, inventory (parts, fuel, lubricants), prepaid insurance, property tax credits, and equipment, which were Lakala's operating assets, and Lakala's name to Maurice Hovious, formerly the chief pilot of Lakala, or to Lakala Aviation, Inc. (New Lakala), a new corporation formed by Hovious, for $32,549.61. (2) New Lakala leased from W-L Molding the real property previously occupied by Lakala for a

15-year term with the option to renew the lease for unlimited additional 5-year terms. No rent was to be charged for the first 12 months; a rental rate was to be established on April 1, 1973, and reviewed annually thereafter. New Lakala assumed responsibility for operating expenses under the lease. Also, according to minutes of a W-L Molding board of directors' meeting, Hovious was to build a new hangar next to the existing hangar in order to comply with City of Kalamazoo requirements. This additional hangar was to revert to W-L Molding after 15 years, at no charge to the company, and then be leased to New Lakala. (3) W-L Molding transferred all the industrial machine tools used to repair or alter molds received from Lakala to J-G Finishing, a corporation controlled by Laure, for their book value of $3,238.78 All former employees of the tool and die operations of Lakala were hired by J-G Finishing at the same rate of pay they had received when working at Lakala. The former Lakala employees never became employees of W-L Molding.

In calendar year 1972, W-L Molding repaid the $68,712.01 balance on the loan Laure had made to Lakala in November 1969.

The liabilities of Lakala, including the advances made by W-L Molding to Lakala, assumed by W-L Molding on March 30, 1972, exceeded the value of the assets received by W-L Molding from Lakala by $194,842.72.

Before the merger, Lakala used prop jets to provide W-L Molding air service. It had a Jet Commander and four other jets held under lease or resale agreements with the manufacturer. Lakala also had a jet engine repair capability that its local competitor, Kal-Aero, did not have.

Within 16 days after the merger, all the jets once held by Lakala were returned to the manufacturer or sold. Having no aircraft of its own, W-L Molding has leased an aircraft (from someone other than New Lakala) since the merger. During 1972 W-L Molding leased a piston engine airplane, and at some later point it leased a prop jet.

On May 1, 1972, W-L Molding borrowed $400,000 from the American National Bank & Trust Co. in Kalamazoo, Mich.

In 1973 W-L Molding completed the hangar on the land owned by it adjoining the Kalamazoo airport "in order to comply with the terms of its lease with New Lakala and with the Kalamazoo

Airport Authorities' requirement that additional hangars be built in order to comply with the base operations requirement."[2]

The assets of New Lakala and the land and hangars owned by W-L Molding but under a 15-year lease to New Lakala were at some point sold in separate transactions to S.P. Air, Inc.

After the merger, W-L Molding had its leased aircraft serviced at the Kalamazoo Airport by New Lakala and, after the sale of assets to S.P. Air, Inc., by S.P. Air, Inc.

Since the merger, W-L Molding has performed no air charter or freight services or any of the other services once performed by Lakala, and it did not occupy the former Lakala buildings at the Kalamazoo Airport.

W-L Molding claimed net operating loss carryover deductions from Lakala of $51,030.86 for its fiscal year ending June 30, 1972, and of $208,826.38 for its fiscal year ending June 30, 1973.

## ULTIMATE FINDINGS OF FACT

George L. Laure's salary and deferred compensation paid by W-L Molding Co. for fiscal years ending June 30, 1972 and 1973, were for services rendered and were reasonable in amount.

Lakala Aviation, Inc.'s business was liquidated and W-L Molding Co. was merely a conduit for distribution of Lakala's assets (or their proceeds of sale). The purported merger of Lakala into W-L Molding Co. did not qualify as a reorganization under section 368(a)(1)(A).

In 1972 George L. Laure received a constructive distribution from W-L Molding Co. as a result of its payment of Lakala's remaining debt to Laure. He received no further constructive distributions as a result of the elimination of W-L Molding's advances to Lakala.

## OPINION

### Issue No. 1

Petitioner W-L Molding Co. paid George R. Laure, its president and treasurer, a salary of $138,445 for fiscal year

---

[2]The quoted language is part of the parties' stipulation. We are confused by this stipulation because Laure's Feb. 18, 1972, letter to the Kalamazoo Airport Authority, minutes of a W-L Molding board of directors' meeting, and the W-L Molding-New Lakala lease all indicate that New Lakala, not W-L Molding, would build the new hangar. Why W-L Molding did so is not readily apparent from the record.

ending June 30, 1972, and $121,245 for fiscal year ending June 30, 1973. For each year it also made payments of $15,660 to a deferred compensation plan for Laure. These amounts were deducted by petitioner as compensation for services rendered.

Respondent determined that the compensation paid by petitioner to Laure was excessive and disallowed $38,160 of the compensation deductions claimed for each year.[3] Respondent's determination carries with it a presumption of correctness, and petitioner bears the burden of proving it is entitled to the deductions claimed. *Botany Worsted Mills v. United States*, 278 U.S. 282 (1929).

Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including a "reasonable" allowance for salaries or other compensation for "personal services" actually rendered. Consistent with the statute, section 1.162–7(a), Income Tax Regs., indicates that the two tests of deductibility for compensation payments are whether they are "reasonable" and "in fact payments purely for services."

The regulations go on to warn that an "ostensible salary," where excessive in relation to that ordinarily paid for similar services and where the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, is likely to be in fact a distribution of earnings upon the stock. Sec. 1.162–7(b)(1), Income Tax Regs. Characterization of payments as dividends, however, is not critical to the issue here. Even if a payment does not represent a distribution of profits, it is disallowed if unreasonable in amount. See *Patton v. Commissioner*, 168 F.2d 28 (6th Cir. 1948).

Respondent "does not question Mr. Laure's qualifications or his value"[4] to W-L Molding, but concludes "that $38,160.48 of the amounts paid by W-L to Mr. Laure constitutes unreasonable compensation for each year as a distribution of earnings and profits of W-L."[5] Specifically, respondent urges that Laure has not received a return on investment in his capacity as sole shareholder of W-L Molding and thus part of the ostensible compensation is in reality a distribution of earnings and profits.

---

[3]Respondent did not explain in the notice of deficiency, at trial, or on brief how he arrived at the amount of excessive compensation. Since the amounts allowed each year differ but the amounts disallowed are the same in each year, we assume that respondent used some sort of formula to compute a reasonable return on investment, and disallowed that amount as compensation.

[4]Brief for respondent at 25.

[5]*Supra* at n.4.

Presumably the $38,160.48 in compensation deductions for each year disallowed by respondent is based upon his calculation of a reasonable return on capital. Compare *Charles McCandless Tile Service v. United States*, 422 F.2d 1336 (Ct. Cl. 1970) (despite its finding that compensation "in and of itself" was reasonable, court found a distribution of profits because no dividends ever had been paid; the court computed a return on capital based on 15 percent of net profits before salaries and Federal income taxes and treated that amount as nondeductible dividends).

We doubt that section 162(a)(1) was intended to permit the Commissioner or the courts to so sit in judgment over whether dividends should be paid in lieu of reasonable compensation to employee-shareholders. This is not to say that a payment, which would be reasonable if paid as compensation for personal services, would be deductible if it was not intended to be payment for personal services actually rendered. See, for example, *Klamath Medical Service Bureau v. Commissioner*, 29 T.C. 339 (1957), affd. 261 F.2d 842 (9th Cir. 1958), and *Paula Construction Co. v. Commissioner*, 58 T.C. 1055 (1972). However, those cases were decided on their own peculiar facts and are inapposite here.

By contrast, we have found that the payments in controversy here were in fact for services rendered. That part of Laure's compensation was contingent upon W-L Molding's net profits before taxes does not alter our finding. Laure's base salary and contingent compensation terms were explicitly provided for at W-L Molding's board of directors' meetings. Laure actually performed substantial services and was paid therefor as directed by W-L Molding's board of directors so that our remaining concern is only whether the compensation paid was reasonable in amount.

One of the most important factors in determining the reasonableness of compensation is the amount paid to similar employees by comparable employers. Or, as the regulations put it: "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Sec. 1.162–7(b)(3), Income Tax Regs. Reasonableness of compensation is, of course, a question of fact, and other factors also should be considered. Among other factors are: The nature of the services to be performed, their value to the employer, the

responsibilities they entail, the time required of the employee in discharge of his duties, his capabilities and training, and the amount of compensation paid in proportion to net profits. *Patton v. Commissioner, supra* at 31. See also *Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949).

To show Laure's qualifications and the value of his services in relation to similar executives, petitioner offered the testimony of a Harold Jacobson, a retired president and chairman of the board of American National Bank & Trust Co. in southwest Michigan. In conjunction with reviewing loan applications over the years, Jacobson became familiar with over 50 closely held corporations similar in size and growth to W-L Molding. The bank also had about 15 plastic molding companies as customers. Jacobson also knew Laure's abilities well since his bank had loaned W-L Molding money steadily for some 25 years. Jacobson rated Laure as one of the top executives he had met. Based on his experience, Jacobson thought Laure's compensation for the years in issue was reasonable compared to similarly situated executives he had known.

Other convincing evidence of Laure's abilities is petitioner's growth from scratch to taxable income before Laure's compensation and net operating losses of $359,378 in fiscal 1972 and $345,731 in fiscal 1973. The record leaves little doubt that Laure, through ingenuity and hard work, was primarily responsible for the success of the business. He formed the company, managed it, and performed the functions of chemical engineer, electrical engineer, sales engineer, production design engineer, and secondary operations manager. He put his ingenious ideas to work for the company as detailed in the findings of fact. At one time he even was the company's pilot.

The CPA and attorney servicing W-L Molding, both with wide experience in dealing with closely held corporations, though hardly disinterested, also testified in support of the reasonableness of Laure's compensation.

Respondent admits that petitioner introduced substantial evidence to show Laure's education, work habits, and his value to W-L Molding. Not questioning Laure's qualifications or value to W-L Molding, respondent still claims these and other factors only support reasonable compensation in the amounts of $115,945 and $98,745 for the 1972 and 1973 fiscal years, respectively. Four factors are urged by respondent as support

for his determination that $38,160.48 of Laure's compensation for each year was unreasonable in amount and was instead a distribution of earnings and profits: (1) Laure's compensation arrangement was not the result of arm's-length bargaining because Laure controlled W-L Molding; (2) Laure's contingent percentage arrangement was not fixed but was optional with Laure; (3) W-L Molding's failure to pay dividends; and (4) the relationship of Laure's compensation to that of George Simpson, W-L Molding's vice president (salary of $28,670 in fiscal 1972 and $33,200 in fiscal 1973).

We agree with respondent that these four factors suggest that Laure's compensation warrants close scrutiny. The failure of a closely held corporation to pay dividends is a signal for even closer examination of whether the compensation paid employee-stockholders is what it purports to be. But in making that examination respondent provides us with little to support his contention. There is evidence that there were some restrictions on payment of dividends; but more important is the evidence that the amounts received by Laure were intended as compensation and were reasonable in light of the value of his services to the company. The method of computing Laure's compensation, its optional feature, and W-L's failure to pay dividends are inconclusive at best. They do not justify an arbitrary determination that, whatever Laure's qualifications and value to W-L Molding, a portion of his compensation was a return on investment. Unlike respondent, we do not find the contingent percentage of net earnings arrangement to be inconsistent with a salary arrangement. There have been numerous cases approving compensation based on a percentage of profits, see, for example, *William S. Gray & Co. v. United States*, 35 F.2d 968 (Ct. Cl. 1925); *Roth Office Equipment Co. v. Gallagher*, 172 F.2d 452 (6th Cir. 1949);[6] *Mayson Mfg. Co. v. Commissioner, supra; Lewisville Investment Co. v. Commissioner*, 56 T.C. 770 (1971), and the fact that Laure did not have to take the full amount he was entitled to does not convert the bonus he did take to something other than compensation. Whatever the agreed-upon formula for determining compensation, the question remains

---

[6]See also *Schanchrist Foods, Inc. v. Commissioner*, T.C. Memo. 1977–129; *Albert Van Luit Co., Inc. v. Commissioner*, T.C. Memo. 1975–56.

whether it was intended to be compensation and was reasonable for the services rendered.

Only the relationship of Laure's compensation to George Simpson's directly goes to the issue of the reasonableness of Laure's salary in light of his value to the company. However, even that factor is not too helpful because Laure's responsibilities were far greater than Simpson's. Respondent offered no comparison to other similarly situated executives to support his determination.

Judging from the record before us, we have found that Laure's compensation was in payment for services and reasonable in amount, and petitioner W-L Molding Co. is entitled to the deductions claimed therefor.

### Issue No. 2

The next issue is whether Lakala and W-L Molding engaged in a statutory merger on March 30, 1972, qualifying under section 368(a)(1)(A)[7] so that pursuant to sections 381(a) and 172,[8] W-L Molding, as the acquiring corporation, succeeds to and may deduct premerger net operating loss carryovers of Lakala, the transferor corporation.[9]

---

[7]Sec. 368(a)(1)(A) provides:

(a) REORGANIZATION.—

    (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—
        (A) a statutory merger or consolidation; * * *

[8]SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

    *        *        *        *        *        *        *

    (2) in a transfer to which section 361 * * * applies, but only if the transfer is in connection with a reorganization described in subparagraph (A) * * * of section 368(a)(1), the acquiring corporation shall succeed to take into account * * * the items described in subsection (c) of the distributor or transferor corporation, * * *

    *     .      *        *        *        *        *        *

(c) * * * The items referred to in subsection (a) are:

    (1) * * * The net operating loss carryovers determined under section 172 * * *

SEC. 172. NET OPERATING LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

[9]That the validity of the underlying reorganization transaction affords a threshold level of attack in the sec. 381 area is indicated by the language of Rev. Rul. 58-603, 1958-2 C.B. 147, where, in announcing that it would not apply the principle of *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957), to a transaction described in sec. 381(a), the Internal Revenue Service added: "However, see sections 382(b) and 269 of the 1954 Code for the possible disallowance of net operating loss carryovers in such transactions, and see the Income Tax Regulations under section 368 of the 1954 Code for the Requirements of reorganization." Secs. 382(b) and 269 are not applicable here because Laure was the

Respondent argues that the business of Lakala was not merged into W-L Molding but was terminated. To support his contention, respondent points out that all assets owned by Lakala shortly before the merger, including the corporate name, were subject to contracts of sale to outsiders entered into prior to the merger and were not used by W-L Molding in carrying on either Lakala's business or its own after the merger. Also, Lakala's liabilities far exceeded its assets. Since Lakala was out of business as of the time of the merger, respondent sees no business purpose that would support a reorganization under section 368(a)(1). Rather, respondent believes the merger was used to acquire Lakala's premerger net operating loss carryovers, to have W-L Molding repay Laure's loans to Lakala, to have W-L Molding repay certain Lakala liabilities Laure and his wife had guaranteed, and to protect Laure's personal reputation by avoiding a default by Lakala on its debts.

Petitioner W-L Molding contends there were several business purposes for the merger, to wit, W-L Molding's need for continued air service capabilities, elimination of duplicative expenses, protection of W-L Molding's financial reputation, and alleviation of certain labor problems.

Qualification of a merger under State law alone is not sufficient for reorganization status under section 368(a)(1)(A). As the regulations indicate, a reorganization also requires that there be a continuity of interest, a continuity of business enterprise, and a business purpose for the transaction.[10]

---

sole shareholder of both Lakala and W-L Molding. See secs. 382(b)(3) and 269(a)(2). Thus respondent relies solely upon the argument that the Lakala-W-L Molding transaction was not a qualifying reorganization.

[10]Sec. 1.368-1. Purpose and scope of exception of reorganization exchanges.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) *Purpose.* \* \* \* The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and (except as provided in section 368(a)(1)(D)) a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. \* \* \*

. (c) *Scope.* \* \* \* A plan of reorganization must contemplate the bona fide execution of one of the transactions specifically described as a reorganization in section 368(a) and for the bona fide consummation of each of the requisite acts under which nonrecognition of gain is claimed. Such transaction and such acts must be an ordinary and necessary incident of the conduct of the enterprise and must provide for a continuation of the enterprise. A scheme, which involves an abrupt departure from normal reorganization procedure in connection with a transaction on which the imposition of tax

The continuity-of-interest requirement demands that the original owners retain a continuing interest in the reorganized corporation. If Lakala was otherwise "reorganized" into W-L Molding, continuity of investment would exist because Laure owned all the stock of W-L Molding and Lakala before the merger and all the stock of W-L Molding after the merger. See *American Bronze Corp. v. Commissioner*, 64 T.C. 1111, 1123 (1975).

Continuity of business enterprise requires "a continuity of the business enterprise under the modified corporate form." Sec. 1.368–1(b), Income Tag Regs. This does not mean that the continuing business must be the same as that conducted by the transferor. *American Bronze Corp. v. Commissioner, supra* at 1123; *Becher v. Commissioner*, 22 T.C. 932 (1954), affd. 221 F.2d 252 (2d Cir. 1955) (reorganization treatment sustained where assets of a sponge rubber and canvas product manufacturing business were transferred to a new corporation formed to engage in upholstered furniture business). Accord, *Bentsen v. Phinney*, 199 F. Supp. 363 (S.D. Tex. 1961). On the other hand, if the transferor's business is not continued there must be some use of the transferor's assets in the transferee's business. Continuity of business is lacking in a purported reorganization if the transferee corporation merely is to dispose of the transferor's assets to unrelated parties in an orderly termination of the transferor's business. *Standard Realization Co. v. Commissioner*, 10 T.C. 708 (1948). For a recent review of these continuity-of-business cases, see *Atlas Tool Co. v. Commissioner*, 70 T.C. 86 (1978).

Finally, to qualify a merger as a reorganization under section

---

is imminent, such as a mere device that puts on the form of a corporate reorganization as a disguise for concealing its real character, and the object and accomplishment of which is the consummation of a preconceived plan having no business or corporate purpose, is not a plan of reorganization.

Sec. 1.368–2. Definition of terms.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b)(1) In order to qualify as a reorganization under section 368(a)(1)(A) the transaction must be a merger or consolidation effected pursuant to the corporation laws of the United States or a State or territory or the District of Columbia.

(g) \* \* \* Moreover, the transaction, or series of transactions, embraced in a plan of reorganization must not only come within the specific language of section 368(a), but the readjustments involved in the exchanges or distributions effected in the consummation thereof must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization. Section 368(a) contemplates genuine corporate reorganizations which are designed to effect a readjustment of continuing interests under modified corporate forms.

368(a)(1), the requisite business purpose must exist. The regulations refer to this requirement at three points: Section 1.368–1(b) (the reorganization provisions describe "readjustments of corporate structures * * * required by business exigencies"); section 1.368–1(c) (a device that disguises a preconceived plan having no "business or corporate purpose" is not a plan of reorganization); section 1.368–2(g) (the transactions must be "germane to the continuance of the business of a corporation" and the statute "contemplates genuine corporate reorganizations which are designed to effect a readjustment of continuing interests under modified corporate forms"). See also *American Bronze Corp. v. Commissioner, supra; Norman Scott, Inc. v. Commissioner,* 48 T.C. 598 (1967).

To summarize, a reorganization envisions continuity of business under modified corporate form together with a continuity-of-shareholder investment in that enterprise. For a transaction to have a business or corporate purpose in support of a reorganization, it must be germane to the continuance of the business of a corporation, a party to the reorganization. *Wortham Machinery Company v. United States,* 521 F.2d 160 (10th Cir. 1975). The facts before us, however, reveal a termination of Lakala's business, that is, sale of its assets to outsiders and payment of Lakala's creditors. In contrast to a reorganization of Lakala into W-L Molding, Laure appears to have liquidated Lakala, using W-L Molding as a conduit to convey Lakala's assets to their ultimate destination outside the surviving corporation. Compare *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945) (distributions to shareholders followed by their prearranged transfer of the property treated instead as if the distributing corporation effected the transfer).

There is no evidence to support a finding that subsequent to the merger W-L Molding either continued any of Lakala's business activities or used any of Lakala's assets in the conduct of its own business. Prior to the merger Lakala was engaged in the air charter and repair service and in light manufacturing. It is stipulated that all the operating assets of Lakala's air charter and repair service were sold to Maurice Hovious pursuant to a preexisting agreement on April 1, 1972; and that the tool and die equipment of Lakala was sold to J-G Finishing on April 1, 1972, pursuant to a preexisting agreement. Within 16 days after the merger all of the planes used by Lakala were returned to the

manufacturers or sold. W-L Molding, itself, did not carry on, or utilize in its business any of the assets of, Lakala's business.

How the land and hangar once owned by Lakala fit into the scheme of things is a mystery. This real estate was transferred by Lakala to W-L Molding on January 3, 1972. Petitioner claims this transfer refutes respondent's liquidation theory because the real estate was not disposed of immediately after the merger. Respondent says the real estate transfer does not conflict with his liquidation view because it was not transferred pursuant to the merger. That this property was transferred 3 months prior to the merger and 6 weeks before the Kalamazoo Airport Authority notified Lakala that its airport lease was to be canceled supports respondent's position. On the other hand, the January 3, 1972, real property transfer apparently was intended as a step in the transactions in issue because the deed of transfer included a statement that "This instrument is to clarify title as a result of a statutory merger.

However, we are not persuaded that the holding of the land and hangar in W-L Molding's name is sufficient to support reorganization treatment. First, it is curious that this property was subsequently sold (we are not told when or at what price). In any event, the record does not reveal that W-L Molding used this property in its business or received any benefit from this property compared to the liabilities it assumed upon the merger. On April 1, 1972, a day after the merger, the property was leased to New Lakala for a 15-year term with the option to renew the lease for unlimited additional 5-year terms. No rent was to be charged for the first 12 months. Although a rental rate was to be established on April 1, 1973, and received annually thereafter, we do not know whether a rent was so determined. New Lakala thus acquired use of the property for an indefinite period and any benefit to W-L Molding is not clear. Moreover, the value of the property appears speculative since the Kalamazoo Aiport Authority canceled Lakala's base operation lease effective April 1, 1972. Without additional information, W-L Molding's holding of the land and hangar (perhaps for only a brief period) does not disturb our conclusion that W-L Molding was just a conduit to aid Lakala's termination.

Petitioner's purported business reasons for the merger do not withstand analysis. The principal reason cited by petitioner in support of the merger was W-L Molding's need for continued air

service and repair capability. According to petitioner, the merger and sale of assets to Maurice Hovious, the former chief pilot of Lakala, would enable W-L Molding to have the same type of aircraft available without the need for using its managerial talent and to have jet aircraft repair that otherwise was not available in the Kalamazoo area. But any continued air service functions resulted from the sale of assets to Hovious and New Lakala, not from the merger.[11] After the merger, W-L Molding, the surviving entity, had no air service capability. All the jets once owned by Lakala were returned to the manufacturer or sold shortly after the merger. During 1972 W-L Molding leased an aircraft (a piston engine aircraft that apparently could be repaired by Kal-Aero) from someone other than New Lakala. But the continued use of an aircraft by W-L Molding in its own business does not amount to a continuation of Lakala's business. The merger of Lakala into W-L Molding therefore did not cause continued air service and repair capability for W-L Molding.

The second business purpose for the merger argued by petitioner was an elimination of duplicative expenses. Some duplication of expenses may have existed in that Lakala's tool and die equipment apparently was related to W-L Molding's activities, but again, any savings resulted from the liquidation of Lakala rather than the merger. The tool and die equipment as well as Lakala's air charter and repair service operating assets were sold on April 1, 1972, pursuant to prearranged agreements. Any duplication in administrative and accounting expenses evaporated when the business activities of Lakala were discontinued.

Another business purpose advanced by petitioner was that the merger was necessary to protect W-L Molding's financial reputation. But the only testimony was that Laure's personal reputation was at stake in avoiding default on Lakala's debts. The benefits to Laure, however, have not been shown to be germane to the continuance of the corporate business. See sec. 1.368–2(g), Income Tax Regs; *Rafferty v. Commissioner*, 452 F.2d 767 (1st Cir. 1971). Most of Lakala's debts were owned to Laure and W-L Molding. We are not convinced that failure of

---

[11]It is clear that W-L Molding had no intentions of carrying on Lakala's air charter business. All the planes were sold, and it is unlikely that W-L Molding would have subjected itself to the possible liabilities arising out of such a business. To avoid this is why Lakala was formed originally.

Lakala to pay its debts would in turn have affected W-L Molding's business.

Finally, petitioner lists the alleviation of certain labor problems as a reason for the merger. However, this claim is not supported in the record. George E. Dombrowski, attorney for Lakala, W-L Molding, and New Lakala, testified that by merging Lakala with W-L Molding, there was some work that Lakala was doing that could be brought back to W-L Molding. Apart from this vague testimony, we are not told what labor problems were to be resolved by the merger.

In conclusion, W-L Molding is not entitled to deduct Lakala's net operating loss carryovers in 1972 and 1973 because the two corporations did not engage in a qualifying reorganization. We agree with respondent that the merger of March 30, 1972, had no business purpose. In addition, though respondent did not press this point, the merger lacked continuity of business enterprise. See *Standard Realization Co. v. Commissioner, supra.*

### Issue No. 3.

In his notice of deficiency, respondent determined that in 1972 petitioner George R. Laure received constructive dividends under sections 301 and 316 from W-L Molding resulting from (1) W-L Molding's repayment of the $68,712.01 balance of a loan Laure had made to Lakala in November 1969 and (2) elimination of $194,842.72 in advances W-L Molding had made to Lakala.[12] Pointing primarily to the alleged business reasons for the merger, petitioner claims W-L Molding's assumption of Lakala's debts was undertaken, as part of the merger, to benefit W-L Molding rather than Laure.

Unwarranted transfers of funds between commonly controlled corporations have been treated as constructive distributions to the shareholders by the payor corporation. But for such transfers to be treated as constructive distributions they must have been primarily for the shareholder's benefit and he must have actually benefited directly therefrom. Indirect or incidental benefits from the transfers are not sufficient to give rise to constructive distributions. Compare *Cox v. Commissioner,* 56 T.C. 1270 (1971) (majority shareholders taxed on constructive

---

[12]Respondent's computation of the constructive dividends is limited to the extent of the amount these debts exceeded the value of the assets received by W-L Molding in the merger.

dividend as a result of gratuitous transfer of funds by brother corporation to sister corporation) with *Rushing v. Commissioner*, 52 T.C. 888 (1969), affd. on another issue 441 F.2d 593 (5th Cir. 1971) (sole shareholder of two corporations not in receipt of constructive dividend because of advances by one corporation to the other (even if treated as contributions to capital) where payor-corporation had significant interest in payee-corporation's successful development; no direct benefit to shareholder).[13]

We have already determined that W-L Molding's merger with Lakala lacked a business purpose. Likewise, we see no benefit to W-L Molding that would warrant its assumption of these liabilities of an insolvent corporation. This does not end the matter, however, because the assumption of these liabilities can result in constructive dividend[14] treatment for Laure only to the extent he actually received a direct benefit therefrom.

The telling fact at this point of analysis is that Lakala was a faltering, insolvent corporation. (Lakala's liabilities exceeded the value of its assets by $194,842.72 as of the time of the merger.) As such, the likelihood of a repayment of Laure's and W-L Molding's loans appears remote. This cuts two ways. First, we believe Laure received a direct benefit from W-L Molding's repayment of Lakala's indebtedness to him because he otherwise probably would not have been paid. On the other hand, we see no direct benefit to Laure from elimination of W-L Molding's advances to Lakala. Since W-L Molding probably would not have been paid in any event, this assumption of Lakala's liabilities resulted in no meaningful benefit to Laure directly.

Accordingly, we conclude that Laure received a constructive dividend of $68,712.01 as a result of W-L Molding's repayment of Lakala's indebtedness to him. He received no other constructive dividends as a result of W-L Molding's assumption of Lakala's liabilities.

Two final points: Respondent also determined that Laure had dividend income from "income allocated back to W-L Molding Company," $14,947.93 in 1971 and $5,247.56 in 1972 as well as from personal use of an automobile, $350 in 1971 and $980 in 1972. Although petitioner on brief commented that his argu-

---

[13]See also *Sammons v. Commissioner*, T.C. Memo. 1971–145, revd. in part 472 F.2d 449 (5th Cir. 1972); *Kuper v. Commissioner*, 61 T.C. 624 (1974), revd. in part 533 F.2d 152 (5th Cir. 1976).

[14]We assume, as the parties have, that W-L Molding has sufficient accumulated or current earnings and profits to support dividend treatment of any constructive distributions.

ments pertaining to the existence of a dividend also apply to these items, we have no factual basis for concluding that respondent's treatment of these items was incorrect. Since petitioner has the burden of proof on these issues, see Rule 142(a), Tax Court Rules of Practice and Procedure, we sustain respondent's determination on these two smaller issues.

*Decisions will be entered under Rule 155.*