THE LUNDY PACKING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lundy Packing Co. v. Commissioner
Docket Nos. 1383-76, 3250-77.
United States Tax Court
T.C. Memo 1979-472; 1979 Tax Ct. Memo LEXIS 53; 39 T.C.M. (CCH) 541; T.C.M. (RIA) 79472; November 28, 1979, Filed *53 N. A. Townsend, Jr., and Lacy H. Reaves, for the petitioner. Mathew E. Bates, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Taxable Year Ended
Deficiency
November 1, 1969
$ 65,820.41
October 31, 1970
97,359.81
October 30, 1971
211,916.84
November 4, 1972
81,354.77
November 3, 1973
47,381.12
November 2, 1974
145,865.76
Concessions having been made, the only issue for decision is whether payments made by petitioner to three of its officers were reasonable compensation fully deductible by the petitioner under section 162(a)(1). [1]
FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioner is a corporation organized under the laws of North Carolina on June 30, 1948, with its principal place of business in Clinton, North Carolina, at the time it filed the petitions herein. Petitioner filed its Federal *54 corporate income tax returns for its taxable years ended November 1, 1969, October 31, 1970, and October 30, 1971, with the Internal Revenue Service Center, Chamblee, Georgia, and for its taxable years ended November 4, 1972, November 3, 1973, and November 2, 1974, with the Internal Revenue Service Center, Memphis, Tennessee. Since its incorporation, petitioner has been engaged in the business of slaughtering hogs and processing and packing pork products at its plant in Clinton, North Carolina. Burrows T. Lundy, Sr. (hereinafter Lundy) was 70 to 75 years old during the taxable years at issue. He was primarily responsible for the organization of petitioner. He has been engaged in the meat packing business during most of his adult life. Prior to the incorporation of petitioner, Lundy had operated a small meat packing plant in Pennsylvania for approximately 20 years. After selling that plant in 1945, Lundy sought a location for a new plant in the southern part of the United States. He believed that low hog prices and the lack of a federally inspected meat packing plant in the South created a favorable opportunity for the establishment of a meat packing plant in that region. In *55 1947, Lundy came to North Carolina to investigate possible locations for the establishment of the plant. The North Carolina Department of Conservation and Development assisted him by suggesting several locations and putting him in touch with the community leaders and key business people in those areas. Clinton, North Carolina, was the location ultimately chosen for the plant because the residents of that area were able to raise the necessary capital for the plant in excess of the amount that Lundy himself was willing to invest. Clinton was an agricultural area and the local people considered the establishment of a meat packing plant in their area desirable as an assured outlet for the sale of their livestock. The Clinton residents were represented in the negotiations concerning the organization of petitioner by the town's attorney, Jeff Johnson. Henry Vann, a successful local businessman, also played a dominant role in the negotiations preceding incorporation and later as a director of petitioner. Petitioner's capital was to consist of 10,000 shares of common stock, having a par value of $10 per share, and 10,000 shares of non-voting, 6 percent cumulative preferred stock. It was *56 agreed that Lundy would contribute $50,000 in exchange for half of the common stock while the local people would contribute $150,000 in exchange for the other half of the common stock and all of the preferred stock. It was also agreed that Lundy would be president and general manager of petitioner and in such capacity would direct the construction and operation of a plant to be built by petitioner at Clinton. The agreement for the organization of petitioner was set forth in writing in a document captioned "AGREEMENT TO SUBSCRIBE FOR STOCK" dated June 16, 1948, and signed by Lundy and members of the Clinton group who subscribed for stock of petitioner. The agreement provided, interalia:
It is further agreed that of the ten thousand (10,000) shares of common stock hereby subscribed, one-half thereof shall be subscribed by B. T. Lundy, and the other half shall be subscribed and distributed among the rest of the parties to this agreement as hereinafter set out. It is further stipulated and agreed that, except by written consent of a majority of interest of the holders of the rest of the common or voting stock of the corporation, the said B. T. Lundy at no time during the life of the *57 corporation shall become the beneficial owner of more than one-half of the outstanding common or voting stock of the corporation, or exercise directly or indirectly more than one-half of the corporate voting power in the control and management of the corporation. It is further stipulated and agreed that upon the formation of the proposed corporation, by-laws shall be adopted providing for a Board of Directors composed of not less than eight members, and it is agreed that so long as B. T. Lundy owns fifty per cent of the common or voting stock of the corporation, he shall be permitted to nominate one-half of the directors and he himself shall serve as President and General Manager of the corporation, and as compensation for his entire services to the corporation, he shall receive a monthly salary at the rate of Seven Thousand Five Hundred ($7,500.00) per year until the plant is in operation. After the plant starts operations, his salary shall be increased to Ten Thousand Dollars ($10,000.00) per year, and in addition thereto, he shall receive a bonus of six per centum of the net earnings of the corporation before income taxes; provided, however, that this bonus provision shall not *58 apply and become operative unless and until the yearly net earnings of the corporation shall amount to ten per centum or more of its outstanding common stock, after payment of income taxes and allowance for the aforesaid bonus. Lundy himself suggested the 6 percent bonus arrangement. His willingness to accept a low-base salary along with a contingent compensation arrangement and his own investment in the corporation gave the local business people confidence in the viability of the enterprise and in Lundy's ability and integrity and thus induced them to invest in petitioner. At a meeting of the board of directors on January 27, 1955, the original agreement with respect to Lundy's compensation was modified retroactive to the year 1954. The minutes of that meeting state: After much discussion and deliberation, upon motion of R. E. Williams, seconded by Henry Vann, the following resolution was unanimously adopted: RESOLVED, that for his services as President of this corporation, B. T. Lundy, Sr., shall receive the following compensation: (1) TEN THOUSAND DOLLARS ($10,000.00) (2) 10% of the FIRST One Hundred Thousand Dollars ($100,000.00) of the consolidated net earnings of the Company *59 and its subsidiaries before taxes; provided, however, that this provision shall be inoperative in any year in which the said net earnings is less than One Hundred Thousand Dollars ($100,000.00). (3) Six Percentum (6%) of the consolidated net earnings of the Company and its subsidiaries before taxes; proved, however, that this bonus provision shall not apply and become operative unless and until the yearly net earnings of the corporation shall amount to Ten Percentum (10%) or more of its outstanding Common Stock, after payment of income taxes and allowance for the aforesaid bonus. RESOLVED FURTHER, that said compensation shall be retroactive to include the calendar year 1954, and all previous months of the year 1955. After the 1955 modification, Mr. Lundy's base salary was $15,000, $10,000 of which was paid by petitioner and $5,000 by petitioner's subsidiaries, plus another $10,000 in any year that the petitioner and its subsidiaries had pretax earnings of $100,000. The bonus was, as in the previous agreement, 6 percent of pretax earnings in any year that such earnings equalled or exceeded 10 percent of the outstanding common stock. The 1955 agreement provided that the net earnings *60 to which the 6 percent bonus was to be applied referred to the consolidated net earnings of petitioner and its subsidiaries. The reference to ten percent of the outstanding common stock was interpreted as 10 percent of the par value of that stock, the par value of which was originally $10.00 per share but was later reduced to $2.00 per share. The subsidiaries referred to in the modified agreement were the Lundy Sales Corporation and the Lundy Company. Petitioner caused the incorporation of The Lundy Sales Corporation was a wholly owned subsidiary in New York on June 2, 1952. Initially, the Lundy Sales Corporation served only as a sales agent for petitioner's products. At the time of trial, it also held legal title to some of the real estate used in petitioner's business. In 1952, petitioner acquired all of the stock of a Kentucky corporation engaged in meat packing operations and subsequently changed the name of such corporation to The Lundy Company. Since 1954, The Lundy Company has operated a fleet of trucks which is the exclusive means of transportation employed by petitioner to transport hogs and other supplies to its plant and to deliver its finished products to market. Lundy's *61 compensation agreement, as modified in 1955, remained in effect throughout the taxable years in issue. The only deviations from the original and modified agreements were certain voluntary reductions of salary by Lundy in 1950 and 1951 and acceptance of notes by Lundy in lieu of cash payments of part of his compensation for a period of time. When Lundy moved to Clinton, North Carolina, in the fall of 1949, he was accompanied by his family, including Mabel Lundy, his wife, his son-in-law, Lewis Fetterman (hereinafter Fetterman), his daughter, Annabelle Fetterman, and his son, Burrows T. Lundy, Jr. (hereinafter Lundy, Jr.). Petitioner began to purchase and sell hogs immediately after its incorporation in June 1949. Construction of the plant was completed and salughtering operations were begun in May 1950. There was no trained labor force in the Clinton area when petitioner began operations. Lundy, Lundy, Jr., and Fetterman all worked on the "kill line," slaughtering and preparing hogs, until people were trained to take their places. Fetterman and Lundy, Jr. also installed and overhauled equipment. Lundy worked 12 to 14 hours a day.Fetterman and Lundy, Jr., worked 12 to 16 hours *62 a day, for salaries of $50 per week. During the taxable years in question, Lundy, Jr. was vice-president and assistant general manager of petitioner and Fetterman was its treasurer and sales director. In 1954, Lundy, pursuant to authority given him as petitioner's president by the corporation's by-laws, established an annual bonus of 3 percent of net earnings for both Fetterman and Lundy, Jr., in addition to their base salaries. Such bonus arrangement was consistently followed from 1954 through the taxable years at issue. It was not, however, set down in writing. In computing the bonuses of Lundy, Lundy, Jr., and Fetterman, net earnings were interpreted to include only net earnings from operations. When the plant first opened, petitioner slaughtered hogs and shipped the carcasses to hog cutters; however, the scope of its operations soon expanded. In the taxable years in question, petitioner slaughtered, cut, and processed the hogs. Its pork products included smoked hams, bacom, boneless hams, and smoked sausages. The whole hog was utilized with parts unfit for human consumption rendered into grease and sold to soap companies or used as animal feed. The skins were used for making *63 gelatin. In order to develop a source of livestock in the Clinton area, during the early 1950's, petitioner loaned over 100 high quality boars to local farmers who had at least 15 sows. From the time of petitioner's organization through 1977, hog production is Sampson County, where Clinton is located, increased significantly, so that by 1977 hog production, which had been insignificant relative to tobacco and cotton production at the time of petitioner's incorporation, had become the leading sector of its agricultural economy. Petitioner's operations contributed to this growth by improving the quality of the hogs and providing a market for the farmers to sell their livestock. There were other slaughtering facilities in southeastern North Carolina during the period of petitioner's operation which were less successful than petitioner and ceased operations. During the taxable years in question, petitioner owned 8 hog-buying stations in North Carolina and controlled two more. When the necessary hogs were not available locally, some were bought in Georgia or the Midwest. Petitioner purchased each day the number of hogs it intended to slaughter the next day and otherwise maintained *64 no inventory of livestock. During the taxable years in issue, the number and cost of hogs slaughtered by petitioner were as follows: Taxable Year
Total Number of
Toal Cost
Ended
Hogs Slaughtered
of Hogs
11-1-69
723,538
$35,716,914.98
10-31-70
813,894
51,745,960.17
10-30-71
951,168
37,236,076.05
11-4-72
865,248
48,122,618.88
11-3-73
845,591
71,924,209.53
11-2-74
934,309
76,352,559.11
Dunn Meat Packers Incorporated (hereinafter Dunn Meat Packers) was organized in 1962 and began operation in late 1963 in Dunn, North Carolina, 25 miles from Clinton. It immediately started to lose money and was substantially in debt. The plant was closed in July 1964. It was reopened the following month and was thereafter operated under petitioner's management pursuant to an agreement entered into on August 15, 1964. The term of the management agreement, which was negotiated by Lundy on petitioner's behalf, has been extended continuously since that time. At all pertinent times, petitioner has selected all the hogs to be slaughtered at the Dunn Meat Packers plant, bought all of the slaughtered hogs, and transported them to its Clinton plant to be cut. During the taxable years in question, about a thousand hogs per day were *65 slaughtered at the Dunn Meat Packers plant All its obligations were current and its financial condition was good. Petitioner's compensation under the management agreement, a commission based on the gross sales of Dunn Meat Packers, was as follows during the taxable years involved herein: Taxable Year
Ended
Amount
11-1-69
$218,606
10-31-70
202,650
10-30-71
187,943
11-4-72
135,634
11-3-73
221,129
11-2-74
178,110
At first, petitioner marketed its product primarily in New York. During the taxable years in question, petitioner marketed its product all along the East Coast from Bangor, Maine, to Miami, Florida, and as far inland as Pittsburgh and Atlanta. Most of the pork products were sold to distributors. Chain stores and processors of items such as hot dogs and bologna were also among petitioner's customers. In its taxable year ended December 31, 1950, the first year of slaughtering operations, peitioner incurred a loss of $45,068. To alleviate its cash shortage, Lundy and Henry Vann personally obtained a $50,000 bank loan and advanced the proceeds to petitioner in December 1950. Petitioner's operations have been profitable in each year subsequent to that ended December 31, 1950. Petitioner's *66 sales and profits have increased and it has continually expanded its Clinton plant. Petitioner's gross sales, net earnings after the payment of income taxes, and expenditures for plant expansion, in each of its taxable years since incorporation, have been as follows: Taxable Year
Expenditure for
Ended
Gross Sales
Net Earnings
Plant Expansion
12-31-48 $ 177,578 $ 429 $ 12-31-49
800,806
4,231
140,518
12-31-50
729,525
(45,068)
130,618
12-31-51
3,537,728
53,100
30,046
12-31-52
5,826, 930
23,797
18,301
12-31-53
8,163,720
41,138
71,185
12-31-54
8,941,540
84,483
10-31-55
4,792,943
29,603
12,265
10- 31-56
6,855,113
86,191
397,717
11-2-57
8,939,110
132,764
193,198
11-1-58
10,810,771
149,186
115,893
10-31-59
10,0 80,255
182,269
196,922
10-29-60
9,464,757
189,159
60,401
11-4-61
11,400,968
155,300
293,574
11-3-62
12,080,211
12 9,388
614,600
11-2-63
12,281,949
169,735
185,876
10-31-34
12,551,768
219,835
230,310
10-30-65
19,570,012
228,989
4 10,598
10-29-66
25,884,279
317,952
335,685
10-28-67
27,318,852
591,273
777,580
11-2-68
29,317,520
544,757
654,115 11-1-69
44,562,968
934,203
1,079,590
10-31-70
54,846,315
1,090,095
587,426
10-30-71
52,662,431
1,824,174
811,249
1 1-4-72
61,355,019
1,121,545
761,081
11-3-73
84,929,830
1,075,013
1,072,531
11-2-74
93,747,465
1,931,721
1,190,121 11-1-75
101,080,548
891,732
802,305
10-30-76
101,699,588
694,506
200,724
10-29-77
105,288,645
1,529,481
1,191,890
*67 During the taxable years at issue, petitioner had approximately 600 employees and a plant of 200,000 square feet in size. Lundy was petitioner's president and general manager from the time of its formation through the taxable years in question. From 1969 through 1974, Lundy was responsible for coordinating all of petitioner's operations to assure that livestock and raw materials were properly purchased, that sales were properly handled, that everyone was treated fairly and that the corporation was operating at a profit. Lundy was consulted daily by Lundy, Jr., Fetterman, and Annabelle Fetterman (petitioner's comptroller and secretary during the taxable years at issue), whenever significant problems arose. Fetterman kept Lundy informed of trends developing in the market. During a work day, Lundy was continually called upon to make decisions as to the price, quantity, and quality of hogs to be bought. Lundy was also responsible for corporate finances. During the taxable years at issue, the board of directors authorized, upon Lundy's recommendation, purchases of silver and Swiss francs. By the time of trial, both the silver and Swiss francs had greatly appreciated in value. Profits *68 from the sale of some of the silver, sold in 1974, were substantial and were not included in net earnings for purposes of determining the officers' bonuses. Lundy worked full time for petitioner and its affiliated companies during the taxable years at issue. He began work between 6:30 and 7:15 in the morning and left his office at 4:30 or 5:00 in the afternoon. He took a maximum of five or six weeks of vacation per year. Lundy served as a director of the Independent Meat Packers Association, the North Carolina Meat Packers Association, and the American Meat Institute, all of which are trade associations. Lundy was well-respected in the Clinton community as an astute businessman who ran petitioner efficiently and who had helped stimulate the local economy. Pursuant to the agreement with respect to his compensation, Lundy received the following compensation from petitioner for the years 1948 through 1977: Taxable Year
Total
Total
Ended
Salary
Bonus
Compensation
12-31-48
0
0
0
12-31-49
$ 3,000.00
0 $ 3,000.00
12-31-50
7,933.33
0
7,933.33
12-31-51
6,783.33
0
6,783.33
12-31-52
10,000.00
2,602 .36
12,602.36
12-31-53
10,000.00
5,397.24
15,397.24
12-31-54
10,000.00
22,339.27
32,339.27
10-31-55
10,000.00
1 2,590.67
22,590.67
10-31-56
10,000.00
24,756.86
34,756.86
11-2-57
10,000.00
27,042.33
37,042.33
11-1-58
10,000.0 0
30,769.77
40,769.77
10-31-59
10,000.00
32,887.80
42,887.80
10-29-60
10,000.00
36,071.19
46,071.19
11-4-61
10, 000.00
32,829.45
42,829.45
11-3-62
10,000.00
34,662.02
44,662.02
11-2-63
10,000.00
35,239.44
45,239.44
10-31-64 10,000.00
41,397.94
51,397.94
10-30-65
10,000.00
35,361.00
45,361.00
10-29-66
10,000.00
53,572.00
63,572.00
10- 28-67
10,000.00
90,207,00
100,207.00
11-2-68
10,000.00
86,384.00
96,384.00
11-1-69
10,000.00
147,003.00
157,003 .00
10-31-70
10,000.00
178,890.00
188,890.00
10-30-71
10,000.00
271,980.00
281,980.00
11-4-72
10,000.00
145,050. 00
155,050.00
11-3-73
10,000.00
138,210.00
148,210.00
11-2-74
10,000.00
227,525.00
237,525.00
11-1-75
10,000.00
123,826.00
133,826.00
10-30-76
10,000.00
100,345.00
110,345.00
10-29-77
10,000.00
199,135.00
209,135.00
*69 Lundy, Jr., began to work for petitioner at its inception when he was 21, at which time he had had some prior experience working with his father in the meat business. During the taxable years in question, Lundy, Jr., was a vice-president and assistant general manager of petitioner, responsible for hog buying, production at petitioner's plant and the Dunn plant, personnel, shipping, sanitation, plant security and The Lundy Company, petitioner's trucking subsidiary. Lundy, Jr., worked from 5:00 in the morning until 5:00 or 6:00 at night. Between 5:00 and 5:15 in the morning, Lundy, Jr., would meet with James C. Hardwick, who supervised petitioner's hog procurement stations, to decide how many hogs would be purchased that day. Hardwick would keep Lundy, Jr., informed about the livestock market during the day. Each day around noon, Lundy, Jr., would set the price at which petitioner would purchase hogs, based on local competition and the availability of hogs in other regions, as well as on information from petitoner's sales people as to what products were in demand. The price would remain in effect until noon of the next day. Lundy, Jr., supervised petitioner's kill floor, inedible *70 department, and lard department and was responsible for assuring that the hogs were cut, trimmed, and chilled properly. To supervise personnel and production at the Dunn plant, Lundy, Jr., spent a few hours there three times a week. He was responsible for supervising the operations of The Lundy Company which included maintenance of the trucking fleet, delivery of petitioner's products to customers, and supervision of about 50 truck drivers. His supervisory responsibilities covered 600 employees. Lundy, Jr., received compensation from petitioner during the years 1948 through 1977 as follows: Taxable Year
Total
Ended
Salary
Bonus
Compensation
12-31-48
0
0
0
12-31-49
0
0
0
12-31-50
2,862.50
0
2,862.50
12-31-51
3,287.80
0
3,287.80
12-31-52
3,921.80
0
3,921.80
12-31-53 *
11,675.11
12-31-54 *
11,733.45
10-31-55 *
7,414.15
10-31-56 *
12,914.49
11-2-57 *
13,788.62
11-1-58 *
17,385.48
10-31-59 *
18,798.30
10-29-60 *
20,380.57
11-4-61
7,498.23
11,414.73 ** 18,914.96
11-3-62
7,280.00
12,331.01
19,611.01
11-2-63
7,280.00
12,619.72
19,899.72
10-31-64
8,840.00
15, 698.98
24,538.98
10-30-65
10,400.00
12,680.50
23,080.50
10-29-66
11,900.00
21,786.00
33,686.00
10-28-67
13,000.00 40,103.00
53,103.00
11-2-68
13,250.00
38,192.00
51,442.00
11-1-69
15,961.56
68,501.00
84,463.06
10-31-70
19,999.72 84,445.00
104,444.72
10-30-71
19,999.72
130,990.00
150,989.72
11-4-72
19,615.11
67,525.00
87,140.11
11-3-73
19,999 .72
64,105.00
84,104.72
11-2-74
20,000.15
108,762.50
128,762.65
11-1-75
20,000.24
56,813.00
76,913.24
10-30-76
20,000.24
45,173.00
65,173.24
10-29-77
20,000.24
94,567.50
114,567.74
*71 During the taxable years in question, Fetterman, as petitioner's treasurer and sales director, supervised sales and had a variety of other responsibilities. Fetterman and his sales force also took care of the collection of accounts. During the taxable years in question, petitioner and between 900 and 1200 accounts. Fetterman travelled 30,000 to 35,000 miles per year by car to visit petitioner's customers or potential customers, visiting every state on the east coast two or three times a year and New York at least once every six weeks. Since as sales director, he was aware of market conditions and knew the direction in which production was headed, Fetterman was responsible for purchasing supplies, such as boxes and seasonings, and supervised three men who worked in the warehouse, receiving, and dry storage. Fetterman was also in charge of construction. He had had vocational training in carpentry, bricklaying, machine shop work, and architectural drafting and design and, prior to petitioner's incorporation, had served in a construction battalion and had been a foreman in a car-building concern. *72 He had drafted the basic layouts for petitioner's original plant, setting down on paper Lundy's ideas for the architect. After the original plant was completed, all further construction was donw with petitioner's own labor force supervised by Fetterman. Fetterman, Lundy, and Lundy, Jr., would discuss what additions were needed and Fetterman would then work out the necessary plans. The plant, which was originally 20,000 square feet in size, was continually being expanded. During the taxable years in issue, aditions to the hog markets, an addition to the garage, new buildings for bacon and smoked meat preparation and packing, an auditorium for employees, and a storage area were added under Fetterman's supervision, so that, in 1974, the plant was close to 200,000 square feet in size. Fetterman was also concerned with the development of new products. He and Lundy, Jr., investigated the European ham market and as a result of their investigation developed a new product, a Danish ham, which proved to be very successful. Fetterman was in charge of petitioner's lardrendering process. He had developed a process and equipment for transporting and selling lard in a liquid state. This *73 system, which had been patented, reduced waste and saved labor. The patent was transferred by Fetterman to petitioner. Fetterman was not entitled to, and did not receive, any compensation for the transfer. Fetterman was responsible for assuring that petitionedr was in compliance with governmental regulations. In the taxable years in question, six or seven Federal inspectors were in the plant at all times. Fetterman was also involved from time to time in attempts to resolve petitioner's waste disposal and air pollution problems. Fetterman had three assistants: a sales manager, a construction foreman, and a man in the warehouse. Fetterman generally started work between 6:30 and 7:00 in the morning and left work between 5:30 and 6:00 in the evening. When travelling on petitioner's behalf Fetterman might work 17 to 18 hours per day. Fetterman received compensation from petitioner during the years 1948 through 1977 as follows: Taxable Year
Total
Ended
Salary
Bonus
Compensation
12-31-48
0
0
0
12-31-49
0
0
0
12-31-50
2,924.46
0
2,924.46
12-31-51
3,287.80
0
3,287.80
12-31-52
3,921.80
0
3,921.80
12-31-53 *
12,630.11
12-31-54 *
11,733.45
10-31-55 *
7,414.15
10-31-56 *
12,914.49
11-2-57 *
13,788.62
11-1-58 *
17,385.49
10-31-59 *
18,798.30
10-29-60 *
20,397.37
11-4-61
7,502.43
11,414.73
18,917.16
11-3-62
7,280.00
12,331.01
19,611.01
11-2-63
7,280.00
12,619.72
1 9,899.72
10-31-64
8,840.00
15,698.98
24,538.98
10-30-65
10,400.00
12,680.50
23,080.50
10-29-66
11,900.00
21,786. 00
33,686.00
10-28-67
13,000.00
40,103.50
53,103.50
11-2-68
13,250.00
38,192.00
51,442.00
11-1-69
14,692.32
68, 501.50
83,193.82
10-31-70
16,999.84
84,445.00
101,444.84
10-30-71
16,999.84
130,990.00
147,989.84
11-4-72
16,672 .92
67,525.00
84,197.92
11-3-73
16,999.84
64,105.00
81,104.84
11-2-74
17,000.29
108,762.50
125.762.79
11-1-75
17,000.36
56,913.00
73,913.36
10-30-76
17,000.36
45,173.00
62,173.36
10-29-77
17,000.36
94,567.50
111,567.86
*74 Petitioner's operations were carried out in accordance with a buiness philosophy, referred to as "the Lundy way," the aim of which was to assure that petitoner's customers received a product of consistently high quality. First, petitioner purchased only top quality, meat-type hogs, using a grading system based on a standard called "the Lundy premium hog", in order to maintain its reputation for selling premium pork. Then, the gogs were split with a hand cleaver, instead of a saw such as other similar companies used. Although more expensive, this procedure avoided bone dust in the meat and slowed the growth of bacteria which reduce the shelf life of a product. Furthermore, although other meat packing companies used a computer to vary the cuts of meat and maximize profits, petitioner's hogs were always cut in the same manner so that pettioner's customers knew exactly what they could expect to receive when they placed an order. The delivery trucks used by petitioner were carefully maintained to guarantee adequate sanitary conditions and refrigeration. Another aspect of "the Lundy way" involved the manner in which petitioner *75 dealt with its customers. First, petitioner accepted no orders which it would not be able to fulfill. Moreover, before a new account was accepted, Fetterman would visit the potential customer and explain the terms on which petitioner did business. Less than five accounts in petitioner's history had remained partially or wholly uncollected. This success in collection was attributable, at least in part, to the understanding reached between petitioner and its customers prior to the time that an account was opened. Lundy was primarily responsible for the conception and development of "the Lundy Way," and the methodology for its implementation although he had significant help from Lundy, Jr., and Fetterman particularly with respect to seeing to its implementation. During the taxable years in issue, petitioner had other managerial personnel who received compensation as follows: Taxable Year Ended
11-1-69
10-31-70
10-30-71
Annabelle Lundy
Fetterman
$10,249.44
$12,552.89
$11,999.52
George J. Hobbs
13.715.95
15,175,63
16,556.42
Clarence C.
Kephart
16,334.37
18,355.36
20,264.13
Harry W. Stiles
18,651.58
20,763.77
20,679.56
James C. Hardwick
14,593.06
15,712.04
17,333.37
Curtis H. Oates
13,910.08
15,528.90
16,868.61
*76 Taxable Year Ended
11-4-72
11-3-73
11-2-74
Annabelle Lundy
Fetterman
$12,230.76
$19,804.69
$21,000.64
George J. Hobbs
18,628.37
19,601.43
22,452.18
Clarence C.
Kephart
23,988.77
26,860.74
31,558.75
Harry W. Stiles
14,303.67
Deceased
Deceased
James C. Hardwick
18,651.37
18,807.70
21,008.39
Curtis H. Oates
18,898.90
19,530.27
21,677.06
Annabelle Fetterman had begun to work for petitioner as a bookkeeper at the time of its organization. During the taxable years in question, she was in charge of accounting records, bookkeeping, financial reports, hiring office personnel, and purchasing office supplies. She supervised 60 people and reported directly to Lundy. George J. Hobbs was trucking supervisor. Clarence E. Kephart began to work for petitioner in 1965. He was plant superintendent from 1965 until 1971 and thereafter was plant manager. In both capacities, his job was to see that operations got started each day, that production was kept flowing, and that quality was maintained. He worked about 50 hours per week and supervised 300 people. Kephart was assistant to Lundy, Jr., who towards the end of the taxable years at issue began to train Kephart to take over some of his work. James C. Hardwick had been hog *77 procurement field manager since 1965. He supervised 20 to 25 hog buyers and graders and a few drivers. In purchasing hogs, he followed a grading system established by the Lundy family. Curtis H. Oates had been with petitioner for 25 years and had been sales manager since 1968. He supervised 12 people, including salesmen, office workers, and warehousemen. He worked 55 to 60 hours per week. Petitioner established a profit-sharing plan for its employees on October 16, 1961. None of the petitioner's officers, including Lundy, Lundy, Jr., and Fetterman, was eligible to participate in the plan. Most of petitioner's employees work under an incentive program which enables them to earn an additional amount equal to a specified percentage of their base wage rate, if certain levels of production are met. Petitioner's initial board of directors had 10 members, five of whom represented the Clinton shareholders. During the taxable years at issue, petitioner's board of directors consisted of Lundy, Mrs. Burrows T. Lundy, Lundy, Jr., Fetterman, N. L. Daughtry, A. G. Thornton, C. R. Rich, R. E. Williams, J. L. Austin, and Dr. a. n. j/ohnson. A. G. Thornton was chairman of petitioner's board *78 of directors from its inception through the taxable years in issue and was one of the initial subscribers to petitioner's stock. R. E. Williams was also one of the original shareholders and directors, as was N. L. Daughtry.J. L. Austin and Dr. a. n. j/ohnson were relatives of Henry Vann and Jeff Johnson, respectively, members of the original board of directors. Austin, Rich, and Thornton were all successful businessmen. The petitioner's initial capital stock was issued to Lundy, members of his family, and unrelated subscribers from the Clinton area as follows: $10.00 Par
$10.00 Par
Stockholder
Common Stock
Preferred Stock
B. T. Lundy, Sr.
4,960
432
B. T. Lundy, Jr. (son)
10
Mabel L. Lundy (wife)
10
Annabelle L. Fetterman (daughter)
10
Lewis M. Fetterman
(son-in-law)
10
Other individuals and
corporations,
unrelated to Lundy
5,000
9,332
Total
10,000
9,764
Of the 68 shareholders unrelated to Lundy, virtually all received preferred and common stock in a ratio of two shares of preferred for every share of common. The Lundy family has never owned less than 50 percent of petitioner's voting stock. During the taxable years in issue, Lundy owned 50 percent and members of his family owned 6.7 percent of petitioner's *79 voting stock. The remaining 43.3 percent of the voting stock was owned by shareholders unrelated to the Lundy family. Petitioner originally issued 10,000 shares of common and 10,000 shares of preferred stock in 1948 and 1949. In 1954, a 100 percent stock dividend was paid on the common stock. In 1955, 10,000 shares of common A stock, equivalent to the common stock in all respects other than that the common A stock was non-voting except under certain circumstances, was issued for cash at its par value of $10 per share. Lundy purchased half of this stock and the local people purchased the other half. Thereafter, the number of common A shares outstanding increased as a result of a series of stock dividends, so that on November 1, 1969, the petitioner's capital stock consisted of 72,603 shares of non-voting Class A common, 20,000 shares of voting common, and 10,000 shares of non-voting preferred stock. During 1970 and 1971, a stock dividend paid in common A stock, a new issue of common A to employees for cash, and a 5 for 1 split of common and common A (with a concomitant reduction of par value from $10 to $2 per share) resulted in an increase to 410,423 and 100,000, respectively, in *80 the number of Class A common and common shares outstanding. Further issuances of common A stock and a stock dividend increased the number of common A shares outstanding to 484,310 at the end of 1974. During the taxable years at issue Lundy, Lundy, Jr., Fetterman, and Mrs. Fetterman also owned 1.7 percent of petitioner's preferred stock and, together with other family members and The Lundy Foundation, owned percentages of petitioner's common A stock by years as follows: Year
Percent
1969
49.7
1970
52.7
1971
52.6
1972
50.4
1973
50.4
1974
49.4
The remainder of the preferred and common A stock was owned by stockholders unrelated to Lundy and his family. On January 20, 1969, the date of petitioner's annual stockholders' meeting, 61 stockholders owned shares of petitioner's common stock, 89 stockholders owned shares of petitioner's common A stock, and 53 stockholders owned shares of petitioner's preferred stock. On January 24, 1972, the date of petitioner's annual stockholders' meeting, 66 stockholders owned shares of petitioner's common stock, 116 stockholders owned shares of petitioner's common A stock, and 56 stockholders owned shares of petitioner's preferred stock. There was little trading in *81 petitioner's stock although some shares were traded in the Clainton area. In connection with the initiation of an ESOP program, petitioner's common and common A stock were valued by a securities firm at the end of 1977 at $11.25. Some shares were sold for as much as $16.50 during or before the taxable years in issue. From the time of its organization until the end of its taxable year ended in 1972, petitioner did not pay cash dividends on its common stock. Thereafter, cash dividends were paid by petitioner on its common and Class A common stock on dates and at rates per share as follows: Dividend Per Shares of Common
Date Dividend Paid
and Class A Common Stock
1-2-73
$.15
1-28-74
.15
1-20-75
.15
1-26-76
.15
1-17-77
.125
1-16-78
.25
Since its incoeporation, total cash dividends paid by petitioner on its three classes of stock were as follows: Taxable Year
Preferred
Common
Class A
Ended
Stock
Stock
Common
12-31-48
0
0
0
12-31-49
0
0
0
12-31-50
0
0
0
12-31-51
0
0
0
12-31-52
0
0 0
12-31-53
0
0
0
12-31-54
28,987.80
0
0
10-31-55
3,000.00
0
0
10-31-56
6,000.00
0
0
11-2-57
6,000.00
0
0 11-1-58
6,000.00
0
0
10-31-59
6,000.00
0
0
10-29-60
6,000.00
0
0
11-4-61
6,000.00
0
0
11-3-62
6,000.00
0 0
11-2-63
6,000.00
0
0
11-31-64
6,000.00
00
978.12
10-30-65
6,000.00
0
18.87
10-29-66
6,000.00
0
0
10-28-67 6,000.00
0
0
11-2-68
6,000.00
0
0
11-1-69
6,000.00
0
0
10-31-70
6,000.00
0
0
10-31-71
6,000.00
0
0
11-4- 72
6,000.00
0
0
11-3-73
6,000.00
15,000.00
65,539.00
11-2-74
6,000.00
15,000.00
71,826.30
11-1-75
6,000.00
15,000.00
72,013.50
10-30-76
6,000.00
14,910.00
72,068.10
10-29-77
6,000.00
12,425.00
132,714.44
*82 For each of the taxable years at issue, respondent determined that reasonable compensation was $100,000 for Lundy and $50,000 each for Lundy, Jr., and Fetterman and that payments in excess of those amounts were not deductible as ordinary and necessary business expenses under section 162(a)(1). Ultimate Finding of Fact
The amounts paid Lundy, Lundy, Jr., and Fetterman by petitioner under their respective compensation arrangements in its taxable years ended in 1969 through 1974, inclusive, were reasonable allowances for compensation for services actually rendered. OPINION
The sole issue for decision in whether payments made by petitioner to three of its officers, Lundy, Lundy, Jr., and Fetterman, in its taxable years ended in 1969 through 1974 constituted compensation reasonable in amount, and, therefore, deductible under section 162(a)(1), to the extent that the payments exceeded the amounts allowed by respondent. The question of reasonableness is one of fact to be resolved on the basis of all the facts and circumstances in a particular case. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 569 (1974), *83 affd. 528 F.2d 176 (10th Cir. 1975).The burden of proving reasonableness is on the petitioner. Botany Mills v. United States, 278 U.S. 282 (1929); Levenson & Klein, Inc. v. Commissioner, supra at 711. The amount of compensation will be closely scrutinized where payments are made by a corporation controlled by the recipient thereof. Levenson & Klein, Inc. v. Commissioner, supra at 711; Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 591 (1972). The numerous factors which are relevant in determining reasonaleness have been frequently reiterated. See Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court; Kennedy v. Commissioner, 72 T.C. 793, 801 (1979); Leach v. Commissioner, 21 T.C. 70, 77 (1953). While we have considered all relevant factors, we mention only those most significant to our decision. Lundy, Jr., and Fetterman received base salaries plus bonuses of three percent of the net operating earnings of petitioner and its subsidiaries prusuant to an arrangement established by Lundy, as petitioner's president, in 1954 and consistently followed thereafter. Lundy himself received a base salary, plus $10,000 contingent *84 upon the pretax consolidated net earnings equalling $100,000, plus a further bonus of 6 percent of pretax net earnings [2], pursuant to the original agreement to subscribe for petitioner's stock dated June 16, 1948, as modified by a resolution of petitioner's board of directors on January 27, 1955. While any form of contingent compensation invites scrutiny as a possible distribution of a corporation's earnings, generally, if contingent compensation is paid pursuant to a free bargain made before the services are rendered, it is allowable as a deduction although it may prove to be greater than the amount which would ordinarily be considered reasonable. Lewisville Investment Co. v. Commissioner,56 T.C. 770, 782 (1971); California Vegetable Concentrates, Inc. v. Commissioner,10 T.C. 1158, 1166 (1948); section 1.162-7(b)(2), Income Tax Regs. Thus, although not determinative, see, e.g., Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,supra, the fact that payments are made pursuant to a long-established compensation arrangement *85 is a relevant consideration. Dielectric Materials Co. v. Commissioner,supra at 591. With regard to the compensation of Lundy, Jr., and Fetterman, we are satisfied from the record as a whole that the services performed by them for petitioner amply justified the compensation they received. We have set out in detail in our findings of fact the nature and extent of Lundy, Jr.'s, and Fetterman's work, as well as the scope of petitioner's operations, on which we base our decision herein and we, therefore, refer only summarily to these findings. Both Lundy, Jr., and Fetterman had over 20 years experience in the meat packing industry. Each worked long hours and had broad responsibilities for several areas of petitioner's extensive and successful operations. Lundy, Jr., was responsible for production at petitioner's Clinton plant and at the Dunn Meat Packers plant managed by petitioner; for procurement of the hogs slaughtered at the plants (averaging more than 850,000 hogs per year during the taxable years at issue); for supervision of some 600 employees; and for management of The Lundy Company, the trucking subsidiary which transported petitioner's raw materials and finished products. *86 Fetterman served as sales director, traveling extensively and visiting all of petitioner's potential customers. He was also responsible for supervising the collection of petitioner's accounts and petitioner had a very good record in this respect. Furthermore, he drafted all plans and supervised all construction required by petitioner for the continual expansion of its plant from 20,000 square feet in 1950 to 200,000 feet at the end of the taxable years in issue. He was also responsible for transporting, storing, and dispensing lard in a liquid state, a technique which he had developed and which reduced costs and waste in petitioner's marketing of lard. In addition, Fetterman served as a general purchasing agent for supplies and packaging, guided by his knowledge as sales director of the products which petitioner would be producing in the near future. Finally, he also played a significant role in the development of new products. Because of their valuable skills and the varied services they rendered to petitioner, an enterprise with average annual-after-tax earnings in excess of $1,300,000 during 1969 through 1974, we believe that the compensation received by Lundy, Jr., and Fetterman *87 was reasonable. Respondent argues that petitioner offered no evidence of salaries paid by similar businesses for like services and, therefore, has not shown the value of Lundy, Jr.'s, and Fetterman's services. While such evidence may have some bearing on the reasonableness of the compensation paid, it is only one factor (see Mayson Mfg. Co. v. Commissioner,178 F.2d at 121), and no inference can be drawn from the absence of such evidence where, as here, the services performed had a unique qulity. Smoky Mountains Beverage Co. v. Commissioner,22 T.C. 1249, 1255 (1954). Respondent draws our attention to the considerably lower salaries paid to petitioner's other managementlevel employees. We consider such salaries to have little bearing on the question of the reasonableness of the salaries paid to Lundy, Jr., and Fetterman because the duties of such employees were simply not comparable in scope to the responsibilities of Fetterman and Lundy, Jr. Each of these other employees was responsible for one narrow area of petitioner's operations, e.g., hog procurement or production or trucking or office work, and did not have a broad supervisory role in multiple aspects of petitioner's operations *88 as did Lundy, Jr., and Fetterman. See Laure v. Commissioner,70 T.C. 1087, 1101 (1978), on appeal (6th Cir., Feb. 27, 1979). We note also that most of petitioner's emplyees were compensated under an incentive plan which allowed them to earn a bonus if certain production levels were met. We have reached our conclusion as to the amount paid to Lundy, Jr., and Fetterman without regard to the long-standing arrangement established in respect of their contingent compensation. In so stating, however, we are constrained to note that, had we felt it necessary to take this arrangement into account, it would have simply reinforced our conclusion on the basis of reasoning which we have elucidated, infra, as part of our analysis of the reasonableness of the amounts paid to Lundy. The reasonableness of the compensation paid to Lundy presents a somewhat more difficult question both because of the much larger amounts he received and because the evidence is not as strong with respect to the extent of his services for petitioner during the taxable years in question as it is with respect to the services of Lundy, Jr., and Fetterman. Nevertheless, on the basis of a careful examination of the record *89 as a whole, we have concluded that the amounts paid to Lundy during the taxable years in question constituted a reasonable allowance for compensation, deductible under section 162, for the reasons set forth below. After evaluating the facts contained in the entire record, we are convinced that the bonus arrangement under which Lundy was compensated, initiated over 20 years before the taxable years at issue, was an arm's-length agreement. The arrangement was established during the negotiations for the organization of petitioner. The evidence indicates that the local investors, who purchased half of petitioner's common stock and virtually all of petitioner's preferred stock, were represented by a competent attorney and an asture businessman who were well-aware of their own selfinterests and the community's needs. Although Lundy himself proposed the bonus arrangement, it is clear from the record that he wished to induce residents of Clinton to invest in petitioner and that the bonus arrangement was a factor in convincing them of Lundy's integrity and of the viability of the proposed enterprise. Where, as here, an agreement for contingent compensation is based on a legitimate exercise *90 of sound business judgment and is reasonable in light of the circumstances in existence at the time it was made, we hesitate to set it aside. Lewisville Investment Co. v. Commissioner,56 T.C. at 782-783; California Vegetable Concentrates, Inc. v. Commissioner,supra.Compare Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31 (71th Cir. 1970), affg. T.C. Memo 1969-14, where the Court found unreasonable contingent compensation based on a formula adopted at a time when shareholder-employees held all of the corporation's stock. We recognize that, because of changes in an employer's business, a compensation arrangement which has remained unchanged for a long period of time may eventually become unrealistic and unreasonable. Kennedy v. Commissioner,supra;Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. at 568. However each case turns on its own facts, Pepsi-ColaBottling Co. of Salina, Inc. v. Commissioner,supra at 567, and on the facts before us, we cannot conclude that Lundy's compensation arrangement had, in the taxable years in question, become unreasonable. First, while we recognize that the amounts in question, particularly in 1971, approached the upper *91 limits of the range that could properly be considered reasonable, we are nevertheless, satisfied that those limits were not exceeded. The principle of bonus compensation carries with it the payment of liberal compensation in good years and moderate compensation in lean years. Roth Office Equipment Co. v. Gallagher,172 F.2d 452, 456 (6th Cir. 1949). Lundy's compensation exceeded $100,000 only once during the 20 years of petitioner's operations prior to the taxable years in issue, after a previous high point of $63,572, and it was extremely volatile during the taxable years at issue. From its highest level in 1971, Lundy's compensation dropped over $125,000 the following year. Lundy worked long hours for petitioner during the taxable years in question. He was consulted on all major decisions and had 50 years experience in the meat packing industry on which to draw. Lundy was largely responsible for the extraordinary success of petitioner since the time of its incorporation. Moreover, the record supports the view that petitioner's earnings during the taxable years at issue were in part the result of Lundy's long efforts and of his management policies with regard to procurement, *92 production, and sales coming to fruition. An employee responsible for the financial success and growth of a large and complex enterprise is entitled to substantial compensation. Laure v. Commissioner,70 T.C. at 1099; Levenson & Klein, Inc. v. Commissioner,supra.Under the foregoing circumstances, we do not consider it significant that Lundy's compensation was increasing as he grew older. See Hammond Lead Products, Inc. v. Commissioner,supra at 34. Moreover, in the light of the record as to Lundy's actual services, we think respondent places undue emphasis on the fact that he took six weeks vacation, a not unduly long period. Furthermore, we note that this is not a case in which the shareholder-employee was free to perpetuate a method of compensation without regard to his fiduciary obligation to other shareholders. During the taxable years in question, shareholders unrelated to the Lundy family owned 43.3 percent of the common stock, between 47.3 and 50.6 percent of the non-voting common A stock, and 98.3 percent of the preferred stock. Compare Kennedy v. Commissioner,supra (shareholder-employee, a trust for his sister's benefit, and his father owned all of the corporation's *93 stock); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,supra (shareholder-employee owned 248 of 250 shares). We note also that at all relevant times at least half [3] *94 of petitioner's board of directors was composed of representatives of the local investors and that the Community leaders who conducted the original negotiations for petitioner's organization were actively involved on the board of directors at the time of the modification of Lundy's compensation agreement in 1955. Moreover, Lundy's discretion in setting the level of his own compensation was limited by the scrutiny to which petitioner was subject because of its need to obtain funds from external sources. In 1950, Henry Vann, one of the Clinton community leaders, loaned $50,000 to petitioner jointly with Lundy, and in 1955 at the time of the modification petitioner sought and obtained a $50,000 investment in common stock from the Clinton residents. While we recognize that petitioner paid no dividends on its common stock until 1973, this factor is not determinative. Laure v. Commissioner,70 T.C. at 1098, 1100. First, we note that the compensation payments in question were not proportionate to stock ownership. Compare California Vegetable Concentrates, Inc. v. Commissioner,10 T.C. at 1166, with L. E. Pinkham Med. Co. v. Commissioner,128 F.2d 986, 988 (1st Cir. 1942). *95 See also Roth Office Equipment Co. v. Gallagher,172 F.2d at 456. Second, petitioner paid substantial stock dividends over the years so that the owner of one share of $10 par common stock purchased in 1948 would have 10 shares of common stock and 27.4 shares of common A stock at the end of taxable years at issue. In 1977, the common and common A stocks were evaluated at $11.25 per share and there was evidence that prior to or during the taxable years at issue some shares had traded for a price of $16.50.Because there was some local trading in the stock, through the sale of shares received as stock dividends, shareholders could well have been able to realize a cash return on their investment. Moreover, virtually all of the original shareholders unrelated to Lundy had purchased preferred and common stock and cash dividends were paid on the preferred stock continuously after 1954. Third, there is sufficient evidence in the record to convince us that the outside shareholders were generally aware of and satisfied with the results of their investment in petitioner and regarded Lundy, Lundy, Jr., and Fetterman as an efficient management team. Finally, this is not a case of controlling *96 officer-shareholders draining the corporation of its profits through diverting those profits to themselves as salaries. Compare Boyle v. Commissioner,53 T.C. 162, 171 (1969); Klamath v. Commissioner,29 T.C. 339, 348-349 (1957), affd. 261 F.2d 842 (9th Cir. 1958). The total compensation of Lundy, Lundy, Jr., and Fetterman was less than 1 percent of petitioner's gross sales in all the taxable years in issue except 1971 when it slightly exceeded 1 percent and, although it ranged from 25 percent to 36 percent of petitioner's after-tax earnings, petitioner was left in sound financial condition after payment of these officers' compensation. [4]
We, therefore, conclude based on the entire record that the payments of compensation by petitioner to Lundy, [5] *97 as well as to Lundy, Jr., and Fetterman, were reasonable in amount and, therefore, deductible under section 162(a)(1). Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable years at issue, unless otherwise specified.↩
*. Breakdown between salary and bonus unavailable for these years. ** Total as stipulated↩
*. Breakdown between salary and bonus unavailable for these years.↩
2. The 6 percent bonus was contingent upon net earnings, after taxes and Lundy's bonus, exceeding 10 percent of the par value of petitioner's common stock.↩
3. Of the ten directors during the taxable years at issue (see p. 28, supra) only four - Lundy, Mrs. Lundy, Lundy, Jr., and Fetterman - appear to have had any relationship to each other. There is not the slightest suggestion in the record that any of the other six were subject to the control of Lundy, although we recognize that, through the ownership of 56.7 percent of the voting common stock, various stockholders who were members of the Lundy family group could theoretically have elected the entire board of directors. In connection with this latter observation, in light of the other factors upon which we base our decision, we find it unnecessary to deal with the question of whether any effort so to do would have violated the provision of the agreement between Lundy and petitioner whereby Lundy's right to designate directors was limited to one-half the board membership. Cf. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,528 F.2d 176, 181-182 (10th Cir. 1975) explaining the change in control which occurred in Mayson Mfg. Co. v. Commissioner,178 F.2d 115↩ (6th Cir. 1949).
4. While a comparable situation existed in Kennedy v. Commissioner,72 T.C. 793↩ (1979), it was only one of many factors, to which this Court pointed -- several of which are simply not present in the instant case.
5. While we have placed considerable emphasis on the long-standing agreement for contingent compensation between Lundy and petitioner, we do not intend to imply that we would necessarily have reached a different conclusion if that arrangement had not been in existence during the taxable years. The question of the reasonableness of Lundy's compensation in the latter context is simply not before us.