DANIEL and MARGUERITE WALSH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BRANDYWINE PRODUCTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walsh v. Commissioner
Docket Nos. 3720-79 and 3721-79.
United States Tax Court
T.C. Memo 1981-336; 1981 Tax Ct. Memo LEXIS 408; 42 T.C.M. (CCH) 267; T.C.M. (RIA) 81336; June 29, 1981
*408 Amounts paid as reasonable compensation determined. Held these amounts are deductible under section 162(a)(1), I.R.C. 1954, and constitute "earned income" for purposes of the limitations on tax ("maxitax") provided by section 1348, I.R.C. 1954. John M. Bernard and Lewis M. Hendler, for the petitioners. Gordon F. Moore, II, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal income taxes against the individual and corporate petitioners as follows: Petitioners
Docket No.
Year
Amount
Deniel and Marguerite Walsh
3720-79
1974
$ 32,980.88
1975
10,709.48
Brandywine Products, Inc.
3721-79
1974
$ 343,640.00
1975
45,765.00 These cases have been consolidated for trial, briefs, and opinion. The issue for decision is the extent to which amounts paid to Daniel Walsh by Brandywine Products, Inc., were reasonable compensation (within the meaning of section 162(a)[1] *409 ), were deductible by Brandywine Products, Inc., and constituted "earned income" to Daniel Walsh for purposes of the limitations on tax ("maxitax") provided by section 1348. [2]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. Petitioner Brandywine Products, Inc. (hereinafter sometimes referred to as "Brandywine"), is a Pennsylvania corporation. When its petition in this case was filed, Brandywine's principal office and place of business was in North Wales, Pennsylvania. When their petition in this case was filed, petitioners Daniel Walsh (hereinafter sometimes referred to as "Daniel") and Marguerite Walsh, husband and wife, resided in Furlong, Pennsylvania. Brandywine was incorporated in 1952; it reported its income using the accrual method of accounting on a calendar-year basis. Since its incorporation, Brandywine was engaged in the business of fabricating precision metal parts for machinery. During the years in issue, it specialized in the production of large-scale *410 rotary components required by the electrical power generating industry for nuclear, steam, and gas turbines; this is a high-technology business. Brandywine undertook what may be described as production contract machining; that is, fabricating customized parts in accordance with the drawings and specifications of its customers. It had no standardized or proprietary parts. The parts which Brandywine fabricated vary in weight from ounces to 5,000 pounds and in diamester from inches to sixteen feet. Some parts could be fabricated to a tolerance of +-.0001 inch. The time required for Brandywine to fabricate a part could vary from thirty seconds to one hundred or more hours. From one to six or seven machines may be required to fabricate a part. The time needed for Brandywine to set up a machine to fabricate a part could take as long as two days to a week. There were ten to twelve machine shops and there may have been another one hundred "cellar" shops [3] in the Philadelphia area, all of which might compete with Brandywine for a given job. Brandywine made sales to some customers outside the Philadelphia area, making the number of competitors outside that area (as well as those located *411 in that area) of some concern to Brandywine. The only shareholders of Brandywine, and the number of shares owned by each from its incorporation through 1975 are shown in table 1. Table 1 1952 through 1964
1965 through 1975
Shareholders
Shares
%
Shares
%
Daniel
80
33-1/3
68
28-1/3
John Walsh
80
33-1/3
68
28-1/3
Stanley Karminski
80
33-1/3
68
28-1/3
Edward McBryan
36
15
240
240
John Walsh is Daniel's brother. Stanley Karminski is the brother-in-law of Daniel and John Walsh. Edward McBryan is not related to Daniel, John Walsh, or Stanley Karminski, but was a college classmate of Daniel. (Daniel, John Walsh, Stanley Karminski, and Edward McBryan are hereinafter sometimes collectively referred to as "the principals".) From 1972 through the years in issue, the principals managed Brandywine's business operations and affairs. From the time they acquired their shares in Brandywine, the principals served as directors and officers of Brandywine. From 1965 through the years in issue, the principals held the offices in Brandywine indicated in table 2. Table 2 Name
Title
Daniel
Vice President
Stanley Karminski
President
John Walsh
Production Supervisor
Edward McBryan
Secretary-Treasurer
Through *412 1973, Brandywine compensated the principals equally. For 1969 through 1973, each of the principals received fixed cash compensation as indicated in table 3. Table 3 Year
Amount
1969
$ 46,500
1970
60,500
1971
60,000
1972
40,000
1973
85,000
On September 5, 1972, Brandywine's board of directors unanimously adopted resolutions in part decreasing each officer's salary for 1972 to $ 40,000 (from the $ 60,000 annual salaries paid for 1971) and committing Brandywine to make up this $ 20,000 salary reduction as soon as Brandywine would be able to do so. In 1973 and in 1974, Brandywine paid each of the principals $ 10,000 pursuant to unanimous resolutions of the board of directors (dated February 20, 1973, and March 1, 1974, respectively) directing that such payments be made in respect of the 1972 salary cut. During the fall of 1973 and the winter of 1973-1974, a change in the business relationship of the principals began to occur. Before 1974, the principals consulted with one another during daily management meetings and participated in major decisions (including making and princing bids to customers and expenditures of more than $ 2,000); however, each of the principals had the following major areas *413 of responsibility: (1) Stanley Karminski--general management, plus miscellaneous matters such as employee relations, legal arrangements, quality control, research and development, liquidating obsolete equipment, and seeking out and purchasing new equipment. (2) John Walsh--the production shop. (3) Edward McBryan--the office force and accounting and financial matters. (4) Daniel--sales and materials purchasing. In earlier years, all of the principals had done sales work. However, by about 1970 Daniel was the only one of the principals to continue in that phase of Brandywine's business. Before 1974, Brandywine's selling procedure was as follows: Daniel would make contact with the customer; the customer would draw its own specifications; Daniel would take the drawings or proposal back to Brandywine to present to the daily meeting of the principals; each of the principals would make an independent determination of whether the job should be accepted, what price should be charged, what equipment should be used, and which employee should do the work; the principals would meet and take an average of the four proposed prices, and this average price would then be submitted as Brandywine's *414 bid. Daniel would always propose relatively high bids. In comparison, John Walsh might propose low bids and the other two principals would recommend more middle-of-the-road bids. This process of bidding on jobs caused significant delays in submitting bids to customers; sometimes Brandywine did not meet bidding deadlines. Also, this process had a significant adverse impact on Brandywine's profit performance since it was not charging the highest price which it could get for each job. In the latter half of 1973, Daniel told the other principals that he needed more money, that the team concept they had been using for bidding did not work well in sales, and that he could make more money for Brandywine if he were given full authority over sales and an incentive compensation package. At this time, Daniel was under a very heavy personal financial load because of the manner in which he desired to support his wife and twelve children, the oldest of whom was about to enter college; and he had not seriously looked for other employment and had no firm offer to join another employer. Stanley Karminski and Edward McBryan were the same age as Daniel and had five and nine children, respectively. *415 John Walsh, who is five years younger than Daniel, had eight children. Brandywine's business success and profitability depended largely on the capacity of the person or persons responsible for selling and bidding, functions over which Daniel had sole responsibility for the years in issue. It took considerable knowledge, experience, and judgment to determine whether Brandywine could fabricate a part requested by a potential customer, to determine the price at which Brandywine could produce that part competitively and profitably, and to properly schedule work for customers. Careful scheduling of manufacturing steps (i.e., the best use of available equipment, personnel, and shop space) was also needed. Daniel was graduated from Villanova University in 1951 with a degree in mechanical engineering. He was employed by Brandywine on a full-time basis since joining the company in 1952. Daniel had not received any degrees nor had any formal instruction in sales or marketing, other than occasionally to listen to "motivation tapes" while driving his car. Of the principals, Daniel had the most experience and aggressiveness in the sales area; he also was very knowledgable about the complete *416 operation of the Brandywine shop. The principals discussed Daniel's proposals and reached agreements revising their decision-making processes and the method of compensating Daniel. After 1973, Daniel was given sole responsibility for making and princing bids to customers, and his responsibility for purchasing raw materials was reassigned to a middle-management employee. During the years in issue, Daniel had no responsibility for such purchasing. Apart from these changes, each of the principals retained the same responsibility as before. Except for decisions regarding bidding, all major managerial decisions continued to be made by the principals acting as a group, rather than individually. John Walsh, Stanley Karminski, and Edward McBryan reserved the right to make suggestions about bidding if Brandywine started to lose money. On March 1, 1974, Brandywine's board of directors, comprised of the principals, unanimously adopted a resolution providing that Brandywine enter into employment agreements with each of its officers for 1974, fixing annual salary for each of the officers other than Daniel at $ 85,000 and for Daniel at $ 115,000 plus a bonus (if earned pursuant to the terms *417 of Daniel's employment agreement). On the same date, a written employment agreement was entered into between Daniel and Brandywine for 1974. This agreement provides for a bonus above the $ 115,000 annual base salary equal to 1 percent of Brandywine's 1974 gross sales and 20 percent of its 1974 taxable income. This agreement also provides as follows: 7. Repayment Requirement. To the extent that any compensation paid to [Daniel] * * * under paragraph 4B hereof is determined to be excessive, unreasonable or otherwise unallowable, in whole or in part, as a deductible expense for federal income tax purposes, [Daniel] * * * shall have the obligation to reimburse [Brandywine] * * * to the extent of such non-deductible amount. At the close of 1973, Brandywine had experienced its best year thus far, in terms of profits and sales; orders by customers were strong and the principals expected sales to be as strong or stronger in 1974 than 1973. It is estimated that sales orders written by Brandywine in January and February of 1974 aggregated between $ 800,000 and $ 1,000,000. The general market for Brandywine's production contract machinery business was favorable in 1974. Some of the sales *418 orders written in 1974 by Brandywine carried over to 1975, in part causing 1975 to be a good year. On February 4, 1975, Brandywine's board of directors, comprised of the principals, unanimously adopted a resolution approving 1975 employment agreements, the terms of which were identical to those for 1974, except that salaries were raised $ 10,000 for each of them. On the same date, a written employment agreement was entered into between Daniel and Brandywine for 1975, with identical terms as the agreement for 1974, except that it provides a base salary of $ 125,000. The principals other than Daniel were paid fixed salaries for the years in issue. No incentive or bonus compensation feature was provided for them, nor were they paid any incentive or bonus compensation in or for either of these years. In 1974, Brandywine's two highest paid employees, other than the principals, were its foreman and its material controller; they received salaries of $ 27,980 and $ 22,980, respectively. Brandywine employed 40 employees in the years in issue. Brandywine paid its employees (other than the principals) wages and salaries totalling approximately $ 600,000 in 1974 and approximately $ 500,000 *419 in 1975. During each of the years in issue, more than 95 percent of Brandywine's sales were made to various divisions of Westinghouse Corporation (hereinafter referred to as "Westinghouse"). Brandywine had no fixed period contract with these Westinghouse divisions and they could have ceased doing business with Brandywine at any time. Demand for parts such as Brandywine fabricates would increase (or decrease) in relationship to the growth (or decline) of Westinghouse's power generating equipment business. At any given time during the years in issue, Brandywine had about $ 100,000 of raw materials on hand for anticipated orders from Westinghouse. Brandywine purchased $ 843,106.38 of merchandise in 1974 and $ 751,646.12 in 1975. Brandywine kept this $ 100,000 worth of raw materials on hand because (1) ability to make quick delivery often was important in securing sales and (2) it generally took a long time for Brandywine to receive raw materials ordered from suppliers. For 1969 through 1976, Brandywine's sales, gross profits, profits before the principals' compensation and Federal income tax, principals' total compensation, compensation paid to Daniel, after-tax profits, and dividends *420 are the amounts shown in table 4: Table 4 Profits Before
Tax and
Gross
Principals'
Year
Sales
Profits
Compensation
1969
$ 1,163,032
$ 587,272
$ 251,211
1970
1,470,812
721,594
361,955
1971
1,265,591
744,559
362,794
1972
828,118
459,378
166,355
1973
1,873,143
898,111
424,471
1974
3,641,018
2,078,026
1,170,672
1975
2,968,127
1,597,230
633,749
1976
2,038,804
1,312,549
516,618
Principals'
Total
Daniel's
After-Tax
Year
Compensation
Compensation
Profits
Dividends
1969
$ 186,000
$ 46,500
$ 40,282
1970
242,000
60,500
69,308
1,200
1971
240,000
60,000
75,171
1972
160,000
40,000
6,220
1973
340,000
85,000
73,308
1,200
1974
590,000
305,000
322,463
24,000
1975
479,000
194,000
102,386
18,000
1976
493,000
160,000
20,913
18,000
On its 1974 Federal income tax return, Brandywine claimed a deduction of $ 305,000 reflecting actual payments [4] *421 to Daniel in that year which were characterized by Brandywine as follows: Base salary
$ 115,000
Incentive compensation
180,000
Payment of a prior year's
salary reduction
10,000
Total
$ 305,000
The "incentive compensation" component of this 1974 payment to Daniel was calculated pursuant to his employment agreement as follows: 1% Bonus
Sales of $ 3,641,018 X 1%
$ 36,410
20% Bonus
Profit before principals'
compensation and
Federal income tax
$ 1,170,672
Less: (1) Daniel's base
salary
$ 115,000
(2) Daniel's 1%
bonus
36,410
(3) Compensation
of the other
principals
255,000
(4) Payments to
the principals
on account of
1972 salary
reduction
40,000
446,410
Profit before 20%
bonus [5] *422 $ 724,262
20%
144,852
Incentive Compensation
[6] $ 181,262 On its 1975 Federal income tax return, Brandywine claimed a deduction of $ 194,000 reflecting actual payments [7] to Daniel in that year which were characterized by Brandywine as follows: Base salary
$ 125,000
Incentive compensation
69,000
Total
$ 194,000
The "incentive compensation" component of the above payments to Daniel for the tax year 1975 *423 was calculated pursuant to his employment agreement as follows: 1% Bonus
Sales of $ 2,968,127 X 1%
$ 29,681
20% Bonus
Profit before principals'
compensation and
Federal income tax
$ 633,749
Less: (1) Daniel's base
salary
$ 125,000
(2) Daniel's 1%
bonus
29,681
(3) Compensation
of the other
principals
285,000
439,681
Profit before 20% bonus [5]
194,068
20%
38,814
Incentive Compensation
[8] $ 68,495
The parties and their experts have taken the positions set forth in table 5 regarding Brandywine's payments to Daniel. Table 5 1974
1975
Amounts deducted by Brandywine[9] *424 $ 305,000
$ 194,000
Amounts determined by respondent
to be reasonable compensation [10]
115,000
115,000
Reasonable compensation, per
petitioners' expert
325,800
150,600
Reasonable compensation, [11] per
respondent's expert
120,690
115,155
Brandywine paid $ 250,000 of reasonable compensation to Daniel in 1974 for *425 services rendered by him in 1974; and paid $ 150,000 of reasonable compensation to Daniel in 1975 for services rendered by him in 1975. OPINION The parties' basic dispute is as to the proper treatment of Daniel's income from Brandywine. Petitioners maintain that the amounts claimed by Brandywine as compensation for Daniel were paid for services actually rendered and were reasonable in amount, within the meaning of section 162(a)(1). They argue that these amounts thus are deductible in full by Brandywine and that, as to Daniel, they constitute "earned income" for purposes of the limitations on tax provided by section 1348. Respondent contends that any amounts paid to Daniel in excess of $ 115,000 for each of the years in issue, were not intended as payments purely for personal services, and even if they were so intended, they were unreasonable in amount for the services he rendered. Respondent argues that these excess amounts are not deductible under section 162(a)(1), that they are not "earned income" under section 911(b), and that therefore they are not eligible for the limitations on tax provided by section 1348. We have found that $ 250,000 paid in 1974 by Brandywine was reasonable *426 compensation for services rendered by Daniel in 1974 and that $ 150,000 paid in 1975 by Brandywine was reasonable compensation for services rendered by Daniel in 1975. Section 162(a)(1)[12] provides for deductions for amounts paid or incurred as reasonable compensation. Section 1348, enacted by section 801(a) of the Tax Reform Act of 1969 (Pub.L. 91-172, 83 Stat. 685), provides that the marginal tax rate applicable to an individual's earned income is not to exceed 50 percent. "Earned income" is defined in section 1348(b)(1) as "any income which is earned income within the meaning of * * * section 911(b) * * *." [13] *427 The parties agree that, under section 911(b), [14] *428 to the extent the amounts paid to Daniel are deductible by Brandywine under section 162(a)(1) as reasonable compensation for services actually rendered, these amounts constitute earned income within the meaning of section 1348(b)(1). See Kennedy v. Commissioner, 72 T.C. 793, 805 (1979), on appeal (CA6 March 14, 1980). See also Home Interiors & Gifts v. Commissioner, 73 T.C. 1142, 1154 (1980). The initial task, then, is to determine how much of the amounts so paid are so deductible. [15]
The question of reasonableness is one of fact which must be resolved on the basis of all the facts and circumstances in the case. Pepsi-Cola Bottling Co. of Salina v. Commissioner, 528 F.2d 176, 179 (CA10 1975), affg. 61 T.C. 564 (1974); *429 Pacific Grains v. Commissioner, 399 F.2d 603, 605 (CA9 1968), affg. a Memorandum Opinion of this Court; [16]Home Interiors & Gifts v. Commissioner, 73 T.C. at 1155; Kennedy v. Commissioner, 72 T.C. at 801; Levenson & Klein v. Commissioner, 67 T.C. 694, 711 (1977).Discerning the intent behind the payments also presents a factual question to be resolved within the bounds of the individual case. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (CA9 1974), affg. a Memorandum Opinion of this Court; [17]Kennedy v. Commissioner, supra; Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (CA5 1973). The two elements of a reasonable compensation issue--"reasonable" and "compensation"--are often intertwined and analyzed as one. See Kennedy v. Commissioner, 72 T.C. at 801-805. Many factors are relevant in determining whether amounts paid were reasonable compensation, but no single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (CA6 1949), revg. an unreported Memorandum *430 Opinion of this Court. In evaluating the record in this case, we bear in mind that respondent's determination must be deemed prima facie correct and petitioners are charged with the burden of establishing that the bonuses and commissions paid were reasonable compensation for services performed by Daniel. Laure v. Commissioner, 70 T.C. 1087, 1097 (1978), on appeal (CA6 Feb. 27, 1979); Levenson & Klein v. Commissioner, supra; Shield Co. v. Commissioner, 2 T.C. 763, 769-770 (1943). On the basis of the record as a whole, we have made the ultimate findings of fact set forth, supra. The following indicia of "reasonable compensation" appear in this case: (1) Daniel did not control Brandywine. For Daniel to receive the payments challenged by respondent, Daniel secured the assent of the other principals. The other principals did not receive commensurate increases. Each dollar of "disproportionate" increase thus paid to Daniel diminished the amount available to the other principals, whether by way of compensation, dividend, or value in stock. [18] *431 (2) After 1973, Daniel's responsibilities were substantially greater than they had been before 1974, in that Daniel had essentially sole responsibility for contract bidding--a responsibility that *432 he previously had shared with the other principals. Proper execution of this responsibility was of critical importance to Brandywine. (3) The bulk of Daniel's increase in pay arose from the incentive bonus arrangement that was entered into early in 1974. The concept of the incentive bonus arrangement (though not necessarily the details of the arrangement) was rationally related to Daniel's contract bidding responsibilities. The "bottom line", of course, is profits, and much of Daniel's bonus depended on the amount of Brandywine's profits. However, while all the principals had roles in the profit picture, Daniel clearly had the major voice in the sales volume picture. But a focus on sales alone might result in inadequate consideration being given to profits. Under the circumstances, it was reasonable to base Daniel's incentive bonus on both profits and sales. (4) Daniel had the unique qualifications of having dealt with Brandywine's customers as its executive marketing representative, as well as being involved with executive decisions in all other areas involved in this highly technical customized-part-producing company for 22 years. Of the four principals, Daniel was the only *433 one with extensive marketing and bidding experience, as well as experience in every other aspect of the business. It would have been difficult to find a replacement with such a breadth of proven background. (5) Brandywine's payments to the principals were not proportional to their stockholdings. Indeed, respondent's determinations as to reasonable compensation are more nearly proportional to stockholdings than are Brandywine's payments. See section 1.162-7(b)(1), Income Tax Regs.
(6) Brandywine's dividend distributions in 1974 and 1975 were substantially greater than they had been in earlier years, both in terms of dollar amounts and as percentages of after-tax profits. The following indicia of unreasonableness of compensation appear in this case: (1) A bonus formula without a ceiling runs a substantial risk of producing a windfall, especially if the sales element of the formula is unaffected by the profitability of the sales. (2) A bonus formula that provides benefits without requiring improvement over prior periods' performance, especially when the base pay is substantial, appears to focus more on the employer's ability to pay rather than on the value of the employee's services. *434 (3) Very little of Brandywine's profits were paid as declared dividends. Petitioners' expert witness utilized a method whereby members of the expert's staff visited Brandywine and interviewed the principals and the shop foreman in order to understand the job content of the various positions in Brandywine. Based on that information, each position was assigned points for its relative value to Brandywine (measured by the respective "Know-How, Problem Solving, and Accountability" for each such position). Brandywine's internal pay structure was then compared to the salary policies of 300 industrial companies, which were mostly Fortune 1000 Companies with annual sales ranging from 80 to 100 million dollars. From this comparison, petitioners' expert opined that a reasonable base salary for Daniel would be $ 87,000 for 1974 and $ 94,000 for 1975, in each case assuming payment of additional incentive amounts. He considered a reasonable incentive plan for Daniel separately from base salary and did not evaluate the plan used by Brandywine, but suggested an alternative plan. At the outset, he determined that profits, not sales, are the "paramount measure" for corporate performance in this *435 case and pegged the suggested incentive plan to pretax profits. In view of his observation that Brandywine's business was cyclical in nature, he assumed that a competent profit level for any given year would equal that for 1973, and that an annual growth of 25 percent in pretax profits would be outstanding performance. Based upon these assumptions, the bonus suggested for Daniel is 50 percent of such profits in the range from competent to outstanding performance and 33-1/3 percent of such profits earned in excess of outstanding performance. Applying this suggested plan to the tax years 1974 and 1975 results in bonuses of $ 238,800 and $ 56,600, respectively, which, in turn, when added to proposed base salaries results in an opinion that payments of $ 325,800 and $ 150,600, respectively, for these years, would be reasonable for Daniel's services. Respondent's expert initially analyzed data for 1974 and 1975 from the American Management Associations' 1975 and 1976/1977 Top Management Reports regarding the average of the total direct compensation (salary and bonus) paid to chief executives of companies in the durable goods and fabricated metal products categories which had annual *436 revenues or net income after taxes within the range of that of Brandywine. From this data, he correlated average compensation paid to such executives in such companies with annual revenues or net income after taxes, by means of regression line formulas. From this he graphically plotted a central trend line of the data. He also plotted upper and lower trend lines, 33 percent above and 33 percent below the central trend line.He then "tested" the trend lines by plotting the top total direct compensation paid officers as a function of annual revenues or net income after taxes of Brandywine and twelve companies in the same Standard Industrial Classification used by Brandywine in its Dun and Bradstreet listing. These twelve companies were all publicly owned and had annual revenues ranging from about $ 12 to $ 170 million in 1974 and from about $ 12 to $ 235 million in 1975; these companies were used because respondent's expert did not have available the data for privately-owned companies of comparable industrial classification to Brandywine. This expert testified that in his opinion the classification used might not be appropriate for Brandywine, but had been used because Brandywine *437 used it in its Dun and Bradstreet listing. Brandywine was the only company found to be significantly above the trend lines in terms of highest total direct compensation paid as related to annual revenues or net income after taxes. An essential feature of respondent's expert's trend-line analysis is that total direct compensation of the examined employees varies directly with the employers' revenues and with the employers' net income after taxes. This analysis was confirmed by this expert's analysis of Research Institute of America, 1975 Executive Compensation Report. In respondent's expert's view, Brandywine's incentive plan was atypical primarily because it lacked a "threshold" earnings level to be achieved and there was no ceiling on the bonus formula to prevent a windfall in a fortuitously profitable year. Based upon the average of the upper trend rates of total direct compensation to annual revenue or net income after tax from the above studies, respondent's expert considered the maximum amount of compensation (salary and bonus) for a chief executive of a company with Brandywine's level of such revenues or such income to be $ 89,400 and $ 85,300 for 1974 and 1975, respectively. *438 (However, see note 11, supra.) Respondent's expert focussed on compensation for a person with functions that appear to be more limited than those served by Daniel. Additionally, respondent's expert acknowledged that Brandywine's field of business was significantly different from many of the businesses that he used for comparison; he did the best he could with what was available. Finally, respondent's expert gave no indication of the extent to which the averages he used in developing his trend lines included bonuses other than incentive bonuses--i.e., other than bonus agreements intended to provide significant incentives to the affected employees. Petitioners' expert focussed on Daniel's work responsibilities to the exclusion of marketplace evaluations of these responsibilities when combined into single jobs. In contrast to respondent's expert, who put controlling weight on the size of the company, petitioners' expert gave no weight at all to that empirical factor. Petitioner's expert constructed a compensation package different from the one used in the instant case and reported the results of the application of that package to the facts here of record. However, he gave no reasons *439 for his choices of particular amounts and percentages, which were critical in arriving at his numerical conclusions. Each expert, in short, focussed on some elements and drew conclusions which ignored the other elements here present. The great differences in their conclusions put us in mind of The Blind Men and the Elephant, a poem by John Godfrey Saxe (Vol. 1, The Home Book of Verse, selected and arranged by Burton Egbert Stevenson, 9th Ed., 1953, pp. 1877-1879). In the poem, six blind men, each examining a different part of an elephant, variously concluded that the elephant was like a wall, a spear, a snake, a tree, a fan, and a rope. And so these men of Indostan Disputed loud and long, Each in his own opinion Exceeding stiff and strong, Though each was partly in the right, And all were in the wrong! On balance, we are most influenced by the above indicia of reasonableness, rather than the opinion of either party's expert. We conclude that the maximum reasonable compensation for Daniel's services was $ 250,000 for 1974 [19] and $ 150,000 for 1975. As to the amounts up to these levels, we *440 believe that Brandywine and the principals other than Daniel intended to pay compensation. We see no evidence bearing out respondent's assertion that the principals other than Daniel caused Brandywine to make the payments because they "wanted to help Daniel through difficult financial times." (Resp. opening brief, p. 19.) Firstly, the principals other than Daniel also had large families and may have had needs of their own. Secondly, nothing in the record suggests that Daniel's needs were short-term in nature. If Daniel's needs were not short-term, what would cause the other principals to believe that funds would be available to assist them when they in turn would encounter financial needs? Thirdly, if assistance of Daniel had been a significant motive, then other methods were available that were more likely to pass the tax collector's muster without dispute. We are persuaded that Daniel's needs played a significant part--they impelled Daniel to make his demands and they served to convince the other principals that Daniel would not allow the pre-1974 arrangements to continue. We are persuaded by the record before us that these matters impelled Brandywine to substantially sweeten *441 the pot of compensation, by way of a bonus incentive arrangement, which (with the concomitant change in Daniel's responsibilities) was designed to keep Daniel with Brandywine and increase the effectiveness of his work in improving Brandywine's profit. Respondent urges us to separate the effects of the change in Brandywine's system of bidding from the effects of the change in Brandywine's system of compensating Daniel. We decline to do so. On the record before us it is clear that both changes evolved as parts of a single package. This is buttressed by the logical relationship of the changes. The change in the bidding system, putting more responsibility on Daniel, is a basic reason for our conclusion that the amounts of reasonable compensation are substantially more than the amounts determined by respondent. We now consider petitioners' contention that $ 10,000 of the amount paid Daniel by Brandywine in 1974 was for services rendered in 1972, with respect to which payment was postponed. Amounts paid in a later year for earlier years' services may be deducted when paid, if the services were undercompensated in the earlier years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); *442 Cropland Chemical Corp. v. Commissioner, 75 T.C. 288, 297-298 (1980), on appeal (CA7 March 21, 1981); R. J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972). In order to be allowed the deduction, the taxpayer must establish the amount of undercompensation for such services ( American Foundry v. Commissioner, 59 T.C. 231, 239-240 (1972), affd. in part and revd. in part 536 F.2d 289, 293 (CA9, 1976)) and that the payment in the later year is intended as compensation for such services. Perlmutter v. Commissioner, 373 F.2d 45, 48 (CA10, 1967), affg. 44 T.C. 382 (1965). Petitioners have established that each of the principals' salaries was reduced by $ 20,000 in 1972. However, the fact of a salary reduction does not lead automatically to a conclusion that the principals were undercompensated for 1972. We cannot tell, from the record before us, what would have been an appropriate level of compensation in 1972. Consequently, we cannot determine the extent, if any, of Daniel's undercompensation for that year. Compare American Foundry v. Commissioner, supra, with Cropland Chemical Corp. v. Commissioner, supra, and R. J. Nicoll Co. v. Commissioner, supra.See also LaMastro v. Commissioner, 72 T.C. 377, 384 (1979). *443 We conclude, then, that the record does not justify our adding any amount--on account of 1972--to the $ 250,000 we have determined was paid as reasonable compensation to Daniel in 1974. As a result, we conclude that Brandywine is entitled to deduct, and the individual petitioners are entitled to treat as earned income, $ 250,000 for 1974 (rather than the $ 305,000 claimed by Brandywine and the $ 115,000 allowed by respondent) and $ 150,000 for 1975 (rather than the $ 194,000 claimed by Brandywine and the $ 115,000 allowed by respondent). The apparent discrepancies referred to in notes 9 and 10, supra, are to be resolved in the Rule 155 computation. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue. 2. The parties have reached a basis for settlement of the only other issues, which relate to the corporate petitioner's 1974 income tax. This agreement is to be given effect in the computation under Rule 155, Tax Court Rules of Practice and Procedure.↩
3. A "cellar" shop is a machine shop without a full range of equipment, which cannot produce many precision parts, but may manufacture a few well.↩
4. Both the 1974 Form W-2 for Daniel from Brandywine, and the individual petitioners' 1974 Federal income tax return, show total compensation of $ 340,000. For that year, Brandywine deducted amounts totalling $ 217,378 and $ 92,488 for pension and profit-sharing plans, respectively. The record does not indicate whether any portion of these amounts was paid on behalf of Daniel, nor does it explain the discrepancy between the $ 305,000 compensation deduction claimed by Brandywine and the $ 340,000 shown on Daniel's Form W-2 and on the individual petitioners' 1974 Federal income tax return.
5. Notwithstanding that the agreement provided that part of Daniel's bonus was to be "twenty (20) percent of [Brandywine's] * * * taxable income", each year Daniel was given twenty percent of the sum of that year's (a) taxable income for Brandywine and (b) 20-percent bonus for Daniel. Thus, each year this portion of Daniel's bonus amounted to 25 percent of Brandywine's taxable income. 6. The actual amount paid to Daniel was $ 180,000. The difference between the amount paid and that due under the above computation is attributable to use of projected figures for 1974 as of December of 1974, and not actual figures for 1974.↩
7. Both the 1975 Form W-2 for Daniel from Brandywine, and the individual petitioners' 1975 Federal income tax return, show total compensation of $ 197,445.13. For that year, Brandywine deducted amounts totalling $ 233,316.20 and $ 84,905.13 for pension and profit-sharing plans, respectively. The record does not indicate whether any portion of these amounts was paid on behalf of Daniel, nor does it explain the discrepancy between the $ 194,000 compensation deduction claimed by Brandywine and the $ 197,445.13 shown on Daniel's Form W-2 and on the individual petitioners' 1975 Federal income tax return.↩
5. Notwithstanding that the agreement provided that part of Daniel's bonus was to be "twenty (20) percent of [Brandywine's] * * * taxable income", each year Daniel was given twenty percent of the sum of that year's (a) taxable income for Brandywine and (b) 20-percent bonus for Daniel. Thus, each year this portion of Daniel's bonus amounted to 25 percent of Brandywine's taxable income. ↩
8. The actual amount paid to Daniel was $ 69,000. The difference between the amount paid and that due under the above computation is attributable to use of projected figures for 1975 as of December of 1975, and not actual figures for 1975.↩
9. See notes 4 and 7, supra↩, regarding the differences between the amounts deducted by Brandywine and the greater amounts shown on Daniel's Forms W-2 and on the individual petitioners' Federal income tax returns. 10. Respondent treats $ 150,000 and $ 119,756.13 as being eligible for "maxitax" treatment by the individual petitioners for 1974 and 1975, respectively. No explanation appears for the differences between these amounts and the amounts allowed by respondent as deductions for Brandywine. ↩
11. In his written report, respondent's expert stated that $ 89,400 for 1974 and $ 85,300 for 1975 was the upper end of the "appropriate compensation range" for Daniel. At the trial, under questioning, he testified that, in his opinion, compensation of 25 percent to 35 percent above these amounts would be "a maximum of reasonable compensation that [he] * * * would expect." Respondent, on brief, treats the 35-percent level (the amounts set forth in table 5) as his expert's illustration of amounts that would be unreasonable, and contends that the $ 89,400 and $ 85,300 figures are his expert's "maxima for the respective years".↩
12. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *↩
13. Subsequent amendments of this provision (changing "earned income" to "personal service income" and revising the definition), by section 302(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1554, and by sections 442(a) and 701(x)(1) of the Revenue Act of 1978, Pub.L. 95-600, 92 Stat 2878, 2920, do not affect the instant case.
14. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (b) Definition of Earned Income.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as a compensation for the personal services actually rendered. * * * [The subsequent amendments of the section heading (by sec. 202(f)(1) of the Foreign Earned Income Act of 1978, Pub. L. 95-615, 92 Stat. 3100, and by sec. 4(c)(1) of Pub. L. 96-595, 94 Stat. 3467) and of subsection (b) (by sec. 1906(b)(14)(A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834) do not affect the instant case.]
15. The record is not clear as to what amounts Brandywine contributed to its pension and profit-sharing plans for Daniel for 1974 or 1975, and respondent has not indicated whether his determinations of reasonable compensation should include any such amounts. See, e.g., Edwin's v. United States, 501 F.2d 675, 679 (CA7 1974); Charles E. Smith & Sons Co. v. Commissioner, 184 F.2d 1011, 1014 (CA6 1950), affg. an unreported Memorandum Opinion of this Court; LaMastro v. Commissioner, 72 T.C. 377, 382-383↩ (1979); sec. 1.404(a)-1(b). Income Tax Regs. Under the circumstances we, too, will ignore these contributions.
16. T.C. Memo. 1967-7↩. 17. T.C. Memo. 1971-200↩.
18. Petitioners argue that we are bound to find the amounts paid Daniel as compensation to be reasonable because they are the result of an "arm's-length bargain," citing section 1.162-7(b)(2), Income Tax Regs.Respondent contends that the fact that the other shareholders were either Daniel's relatives or friend, considered with his overall financial needs in the years in issue, should lead us to conclude the payments in issue were not intended as compensation for Daniel's services, but to help him out of a bad financial situation. We do not believe that we are bound by this "bargain" as petitioners contend, but can decide if the amounts paid constitute a reasonable allowance for compensation under all the circumstances. See section 1.162-7(b)(3), Income Tax Regs.↩ However, in deciding whether such amounts do constitute reasonable compensation, we give weight to the fact that the other principals diminished the amounts available to themselves. We also note that respondent does not contend that any part of the disputed amounts should be excludible from the income of the individual petitioners under section 102 (relating to exclusion of gifts).
19. The tax treatment of the additional $ 10,000 paid in 1974 for 1972 is considered below.↩